726 So.2d 1258 (1998)
Michael TURNLEY, Appellant,
v.
Melody Kay Ryan TURNLEY, Appellee.
No. 97-CA-00146 COA
Court of Appeals of Mississippi.
December 30, 1998.
*1259 Walter W. Teel, Jackson, Attorney for Appellant.
Billy Parlin, Ocean Springs, Attorney for Appellee.
Before THOMAS, P.J., and COLEMAN, and HINKEBEIN, JJ.
COLEMAN, J., for the Court:
¶ 1. Michael Turnley (Mr. Turnley) appeals from the judgment of divorce rendered by the Jackson County Chancery Court in which that court granted him a divorce from Melody Kay Ryan Turnley (Ms. Turnley) on the ground of adultery. In its judgment of divorce, the chancery court denied Mr. Turnley's claim for reimbursement of disability benefits totaling $18,900 which Ms. Turnley received pursuant to her husband's power of attorney after Mr. Turnley's conservator had revoked it. The court ordered Mr. Turnley to pay his wife rehabilitative alimony at the rate of $150 per month until August 7, 1999, the date that Mr. Turnley's disability benefits terminated under his insurance policy, or until Ms. Turnley remarried, whichever event first occurred. We quote verbatim from Mr. Turnley's brief the following two issues which he presents for our analysis and resolution:
1. The court erred in not ordering the Appellee to reimburse the Appellant for certain funds she misappropriated.
2. The court erred in granting the Appellee alimony.
We affirm.

I. FACTS
¶ 2. Michael and Melody Turnley married on August 25, 1977, in Memphis, Tennessee. *1260 Two children, Jena Marie, a daughter born July 20, 1978, and Micah, a son born October 2, 1980, were born to the Turnleys' marriage. During their marriage, Melody did not work outside the home. Around December 24, 1988, Mr. Turnley sustained severe and permanently disabling brain damage in a motorcycle accident. Because the motorcycle accident left Mr. Turnley permanently disabled, he received disability benefits paid by the Social Security Administration at the rate of $941 per month and by the INA Insurance Company (INA) at the rate of $300 per week, or $1,295.38 per month. These benefits were scheduled to terminate on August 7, 1999, even if Mr. Turnley remained disabled after that date. On February 7, 1990, Mr. Turnley executed and delivered to Ms. Turnley a general power of attorney which empowered her to manage his affairs, including her negotiating INA's check to pay Mr. Turnley's weekly disability benefit in the amount of $300.
¶ 3. On October 31, 1990, Ms. Turnley called Mr. Turnley's mother, Mary Turnley, who lived in Jackson, to tell Mary Turnley that because she could no longer care for Michael Turnley, she, Melody Turnley, intended to place him in a nursing home. Melody Turnley testified that she inquired if Michael Turnley's mother would take her son into her home to care for him. Mary Turnley's version of her daughter-in-law's telephone conversation was that Melody Turnley told her that she "was through with" Michael and would put him into a nursing home unless Mary Turnley and her husband wanted to take him to their home in Jackson. Regardless of the exact nature of the conversation between Melody and Mary Turnley, Mary Turnley and her husband left Jackson the same day, October 31, and drove to their son's home in Jackson County. The next day, November 1, 1990, Michael Turnley's parents returned with their son Michael to their home in Jackson, where Michael Turnley remained through September 26, 1996, the date that the trial of this case began.
¶ 4. On November 21, 1991, slightly more than one year after Mary Turnley and her husband returned to their home in Jackson with their son, Michael Turnley executed a revocation of the power of attorney delivered to his wife, Melody K. Turnley, on February 7, 1990. On December 7, 1993, the Chancery Court of the First Judicial District of Hinds County appointed Mary Turnley the conservator of Michael Turnley's estate. About the time that she was appointed her son's conservator, Mary Turnley notified INA that her son had revoked the power of attorney which he had delivered to his wife and that she, Mary Turnley, was now the conservator of her son's estate. With this notification, INA stopped sending Michael Turnley's weekly disability checks in the amount of $300 to Melody Turnley, Michael's wife, and began to send the checks to Michael's mother, Mary Turnley. The total amount of the INA disability benefit checks which Melody Turnley received between the time her husband terminated her power of attorney and INA began to send the checks to Michael's conservator, Mary Turnley, was $18,900.
¶ 5. During the summer of 1991, after Michael Turnley's parents had taken him back to Jackson to live with them, Melody engaged in an adulterous relationship with a married man whom she had engaged to repair the porch to the Turnleys' home in Jackson County.

II. LITIGATION

A. Pleadings and Pre-trial procedure
¶ 6. As Michael Turnley's conservator, Mary Turnley filed a complaint for divorce on behalf of her son on March 21, 1994, "on the grounds of cruel and inhuman treatment, adultery, desertion, or, in the alternative, irreconcilable differences." In this complaint for divorce, the conservator also sought reimbursement of her ward, Michael Turnley, by Ms. Turnley for the disability checks which she received and cashed from October 31, 1991, through January 29, 1993, in the amount of fifty thousand dollars. Ms. Turnley filed her answer in which she denied that she owed her husband $50,000, and she filed a counterclaim for divorce against Mr. Turnley *1261 in which she sought a divorce from her husband on the grounds of "habitual cruel and inhuman treatment, or adultery, or in the alternative, irreconcilable differences."

B. Judgment of Divorce
¶ 7. We reserve recitation of the testimony and evidence which the Turnleys adduced during the trial in this case for our review and resolution of the issues which Mr. Turnley presents in his appeal. The chancellor declined to render an opinion from the bench at the conclusion of the trial but, instead, took the case under advisement. On January 7, the chancery court rendered its judgment of divorce by which it granted to Mr. Turnley a divorce from Ms. Turnley on the ground of adultery. The chancellor awarded Ms. Turnley "paramount custody of the minor children," Jena, age eighteen, and Micah, age fifteen. The chancery court ordered Mr. Turnley to pay Ms. Turnley child support in the amount of $500 per month, against which monthly amount Mr. Turnley was to be credited with any Social Security benefits which either child received because of Mr. Turnley's disability.[1] Further, Mr. Turnley was ordered to pay Ms. Turnley periodic rehabilitative alimony at the rate of $150 per month until either the date of Ms. Turnley's remarriage or August 7, 1999, whichever occurred first. August 7, 1999, is the date that INA would stop paying Mr. Turnley disability benefits. The chancellor denied Michael's request for reimbursement of disability funds received and used by Ms. Turnley between October 31, 1991, and January 29, 1993.

III. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

A. Mr. Turnley's first issue

1. Mr. and Ms. Turnley's arguments
¶ 8. Mr. Turnley's first issue is that the chancellor erred when he denied Mr. Turnley's claim for reimbursement of disability benefits totaling $18,900 which Ms. Turnley received and negotiated pursuant to a power of attorney executed by Mr. Turnley on February 7, 1990. His argument is two-pronged. First, he argues that the power of attorney created a fiduciary relationship between his wife and him so that Ms. Turnley owed him a duty to compensate and reimburse him for the sum of money which she wrongfully converted to her own use after his conservator had revoked his power of attorney by a revocation of power of attorney dated November 21, 1991. Second, Mr. Turnley charges that his wife's negotiation of these weekly benefit checks, each in the amount of $300, constituted fraud on her part for which she remains "accountable in damages."
¶ 9. Ms. Turnley counters that because she never received notice of the cancellation of the power of attorney until the insurance company discontinued mailing her its weekly checks on January 29, 1994, her authority to act as Mr. Turnley's attorney-in-fact continued until that date. She denies Mr. Turnley's allegations of wrongful or fraudulent misconduct as her husband's attorney-in-fact.

2. The first prong of Mr. Turnley's argument.
¶ 10. Mr. Turnley cites McKinney v. King, 498 So.2d 387, 388 (Miss.1986), in which the supreme court established:
It is fundamental law that an agent owes his principal absolute good faith and fidelity, and he cannot in the exercise of his authority as agent acquire property or interest therein rightfully belonging to his principal without full disclosure and free consent of his principal. Any property or interest obtained thereby is voidable by, and may be set aside by the principal or his estate.
(citations omitted). Mr. Turnley concedes "that during those periods of time when he *1262 was actually residing with his wife, [Ms. Turnley had] the authority to receive his disability income checks and cash them." He further acknowledges that while he was living in the family home, he "certainly derived at least some benefit [from the disability checks]."
¶ 11. Ms. Turnley testified that after her husband's parents returned their son to their home in Jackson, she continued to negotiate Mr. Turnley's weekly disability checks and use their proceeds to pay "for the care of [Mr. Turnley's] family, me and the children and what bills we had remaining." Ms. Turnley elaborated that none of her husband's bills nor any of his family's bills "went to Jackson with him." Ms. Turnley further explained that she and her husband owed American Express, Sears Roebuck, and McRae's and that some of the money which she received from cashing her husband's weekly disability checks "went to pay our bills that we had there." Mr. Turnley offered no evidence that Ms. Turnley "acquire[d] property or interest therein rightfully belonging to [him] without [her] full disclosure and [his] free consent." See McKinney, 498 So.2d at 388.
¶ 12. This Court concludes that Ms. Turnley's unrefuted testimony about her use of these weekly disability checks combined with Mr. Turnley's failure to demonstrate that his wife acquired some interest in the proceeds from the disability checks without her full disclosure refute Mr. Turnley's first prong of his argument on his first issue. Especially is this true since Mr. Turnley concedes that his wife had "the authority to receive his disability income checks and cash them" while he resided with her in their home.

3. The second prong of Mr. Turnley's argument.
¶ 13. For his second prong, Mr. Turnley argues that his wife owed his mother, whom the Hinds County Chancery Court had appointed his conservator, the duty of telling his conservator about her receipt of these weekly disability benefit checks. To support his argument he cites Van Zandt v. Van Zandt, 227 Miss. 528, 86 So.2d 466, 470 (1956), in which the supreme court established the duty of a person who occupies a fiduciary relationship to reveal relevant facts to his principal with the following language:
It is the prevailing rule that, as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act; and that mere silence on his part as to a cause of action, the facts giving rise to which it was his duty to disclose, amounts to a fraudulent concealment within the rule under consideration.
(quoting Note, What Constitutes Concealment Which Will Prevent the Running of Statute of Limitations: Stetson v. French, 321 Mass. 195, 72 N.E.2d 410, 173 A.L.R. 569, 588 § 13 (1948)). Mr. Turnley contends that Ms. Turnley "had a duty to tell her mother-in-law [Mary Turnley] about the insurance checks" and that "[h]er failure to do so constitutes a concealed fraud." Thus, "[u]nder the Van Zandt case, the failure of a fiduciary [Ms. Turnley as her husband's attorney-in-fact] to reveal facts [about her receipt and negotiation of Mr. Turnley's disability benefit checks] when she [was] under a duty to do so constitute[d] fraud."
¶ 14. Mr. Turnley bases his argument on his conservator's testimony about her conversation with Melody Turnley as the conservator was leaving the Turnleys' home in Ocean Springs on November 1, 1990, to return Mr. Turnley to his parents' home in Jackson. We quote that testimony:
The next morning we got there and we picked Mike up and as we were leaving do you want me to tell all of this? Okay. As we were leaving I told Melody, I said, Melody, I know you have much money and *1263 we are retired so if you would please help however you can, no certain amount but however you can help a little with expenses of Michael, we would appreciate it. She said, well, Mary you know I don't have any money. I said, well yes, I realize that, of course. I didn't know about all this money that was coming in every week and every month. And three years later we found out that she had beenshe was at the time cashing in all these checks.
Van Zandt could only apply in the case sub judice if a fiduciary relationship existed between Melody Turnley and Mary Turnley on November 1, 1990, the date of the conversation between Mr. Turnley's mother, Mary Turnley, and his wife, Melody Turnley. However, Mr. Turnley does not explain the basis for the chancellor's finding such a fiduciary relationship between his wife and his mother. The basis could not be Mary Turnley's appointment as conservator for Mr. Turnley because the Hinds County Chancery Court did not appoint her conservator for Mr. Turnley until December 7, 1993, more than two years after the conversation occurred. Mr. Turnley does not rely on the nine elements of fraud as set forth in Allen v. Mac Tools, Inc. 671 So.2d 636, 642 (Miss. 1996), as a basis for the chancellor's finding that Ms. Turnley's failure to tell his mother and conservator about the disability checks was fraudulent. Mr. Turnley's failure to explain the basis for the asserted fiduciary relationship between his wife and his mother on November 1, 1990, requires that we resolve his second prong of his first issue against him.

4. Resolution of the first issue

a. Review of the record
¶ 15. During the trial, Mr. Turnley's conservator testified that she sent Michael Turnley's wife a copy of the revocation of the power of attorney, but she admitted that she did not send the revocation by certified mail. Thus, Mary Turnley produced no documentation to establish that Ms. Turnley had received the revocation of the power of attorney in the mail. Instead, Mary Turnley relied on the "presumption" that the United States Postal Service would have returned the copy of the revocation to her had it been unable to deliver it to Melody Turnley because she testified that the postal service did not return it to her. Ms. Turnley testified that she did not receive notice of the revocation until she stopped receiving the disability checks on January 29, 1993. The insurance company sent her a copy of the revocation after January 29, 1993, in response to her inquiry about why she was no longer receiving these checks.
¶ 16. The chancellor's findings of fact which were relevant to Ms. Turnley's argument on Mr. Turnley's first issue were the following: "[Ms. Turnley] admits that she knew of the power of attorney but denies that it was revoked, and felt she acted in good faith when cashing the checks in question." "[T]here is no question that a power of attorney was entered, filed and duly notarized by Michael Turnley ... dated February 7, 1990. A revocation of that power of attorney was signed on November 21, 1991. During this time, Ms. Turnley was receiving $300.00 a month and failed to, as she contends, receive notice of the revocation." The chancellor continued, "Nevertheless, there is certainly a question as to who would have been entitled to this money since it was ... for the use and benefit of Michael." "The Court cannot say all the money ... from the insurance proceeds [was] wrongfully converted." In the judgment of divorce, the chancellor simply ordered "[t]hat the Husband's claim for reimbursement for his disability payments received and used by the wife and children, be and the same is hereby denied."

b. Review of the law
¶ 17. More than one-hundred years ago, in Robertson v. Cloud, 47 Miss. 208, 208 (Miss. 1872), the Mississippi Supreme Court dealt with the matter of whether Robertson, the owner of a plantation in Coahoma County, owed Cloud what today would be deemed a real estate agent's commission for Cloud's having found a purchaser for Robertson's *1264 plantation. Robertson maintained that he had canceled Cloud's agency to sell the plantation before Cloud found the purchaser. Robertson, 47 Miss. at 209. The supreme court affirmed the circuit court's judgment rendered in favor of Cloud for $350 because there was testimony that Cloud had found the purchaser before Robertson actually notified Cloud that he had canceled his agency. Id. at 210-11. The supreme court opined that "[t]he revocation of an agency to be operative must be made known to the agent, and becomes effective from that time as to him." Id. at 210 (citation omitted).
¶ 18. In U.S. v. Summit Fidelity & Sur. Co., 408 F.2d 46, 47 (6th Cir.1969), the United States Court of Appeals for the Sixth Circuit agreed with the Mississippi Supreme Court's Robertson pronouncement as follows:
"The revocation or renunciation is effective when the principal or agent learns that the other no longer consents to the continuance of the authority." Restatement (2d) Agency, § 119(c) "(A) principal's revocation of his agent's authority is ineffective until communicated to the agent." Jas. H. Matthews & Co. v. N.L.R.B., 354 F.2d 432, 438 (8th Cir., 1965), cert. den. 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966). "As between the principal and the agent a revocation of authority does not become effective until it is in some way communicated to the agent." 2 C.J.S. Agency § 77b(1).

c. Application of the law to the chancellor's findings of fact
¶ 19. "Where conflicting testimony is presented, expert and otherwise, the chancellor is required to make a judgment on the credibility of the witnesses in order to resolve the questions before the court." Broadhead v. Bonita Lakes Mall, Ltd. Partnership, 702 So.2d 92, 101 (Miss.1997) (citations omitted). In the case sub judice, the conservator, Mary Turnley, testified that she mailed a copy of the revocation of the power of attorney to Melody Turnley, but Melody Turnley testified that she never received it. The chancellor adjudged Melody Turnley to have been the credible witness because he found that she "failed to, as she contend[ed], receive notice of the revocation." The chancellor's finding of this fact allows this court to apply the Robertson rationale to affirm the chancellor's denial of Mr. Turnley's claim for reimbursement of his disability payments which Ms. Turnley cashed.[2]

5. Constructive trust argument
¶ 20. In what appears to have been an after-trial thought, Mr. Turnley cites two cases to support his "further position" that Ms. Turnley's "misappropriation of the insurance proceeds constitutes a constructive trust under the law." However, neither the pleadings nor the trial presented this issue for the chancellor's review and resolution. In Marshall v. Marshall, 205 So.2d 644, 646 (Miss. 1968), the supreme court opined:
Therefore, since this Court has repeatedly held that "questions of whatever nature not definitely raised in the trial court and preserved for review will not be noticed on appeal," we will not reverse this case on an issue not previously presented to the trial court. See the many cases collected by Judge Griffith in Mississippi Chancery Practice section 676 (2d ed.1950).
Marshall is our authority for declining to notice on appeal whether Ms. Turnley's "misappropriation of the insurance proceeds constitute[d] *1265 a constructive trust under the law" because Mr. Turnley never presented this issue to the chancellor for his resolution.

B. Mr. Turnley's second issue

1. Mr. and Ms. Turnley's argument s
¶ 21. For his second issue, Mr. Turnley asserts that the chancellor erred when he awarded Ms. Turnley periodic rehabilitative alimony in the amount of $150 per month. We note that the chancellor provided that Ms. Turnley's alimony "automatically cease upon her remarriage" or on August 7, 1999, the date of termination of Mr. Turnley's disability payments, whichever should occur first. Mr. Turnley's position is not "that solely on the basis of [Ms. Turnley's] adultery should [she] be denied the alimony awarded by ... the [chancery] court." However, he "considers the misappropriation of disability insurance income by [Ms. Turnley], at a time when his mother had his total care, to be a wasteful dissipation of assets." Wasteful dissipation of assets is one of the twelve factors to be considered by the court in alimony awards. Hammonds v. Hammonds, 597 So.2d 653, 654 (Miss.1992). Mr. Turnley then stresses "his need for constant care and therapy, his medical expenses, and his total lack of ability to earn income," which, he argues, "mandate[s that] the court should not have granted [Ms. Turnley] any alimony."
¶ 22. Ms. Turnley understandably agrees with Mr. Turnley's position that adultery is no longer a per se bar to an award of alimony to the adulterous spouse. She cites Carrow v. Carrow, 642 So.2d 901, 904 (Miss. 1994), in which the supreme court explained that "adultery should not stand as an absolute bar to alimony, especially, we believe, when denial of alimony would render the wife destitute." (quoting Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss.1992)). She adds, "In light of the fact that [she] had a job making $4.50 per hour, was going to school and supporting two (2) children, and [her husband's] income was $2,236.38, the chancellor was not manifestly wrong in awarding alimony."

2. Standard of review
¶ 23. On appeal, this Court will not reverse the chancellor's decision regarding an award of alimony unless it finds that the decision was manifestly erroneous or "against the overwhelming weight of the evidence." Hubbard v. Hubbard, 656 So.2d 124, 131 (Miss.1995); Crowe v. Crowe, 641 So.2d 1100, 1102 (Miss.1994). "The word `manifest', as defined in this context, means `unmistakable, clear, plain, or indisputable.'" Brennan v. Brennan, 638 So.2d 1320, 1323 (Miss.1994) (quoting Black's Law Dictionary 963 (6th ed.1990)). Great deference is given to the chancellor because he is in a better position to determine what action would be fair and equitable in the situation than a court of appellate jurisdiction. Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992).

3. Review of the record
¶ 24. We summarize the portions of Ms. Turnley's testimony which we think are relevant to this second issue as follows. Ms. Turnley had only a high school diploma when she married Mr. Turnley on August 25, 1977, in Memphis, Tennessee. Mr. Turnley required his wife to remain at home to raise their two children. When this case was tried on September 5, 1996, Ms. Turnley was enrolled full-time at the Jackson County campus of the Gulf Coast Community College where she was studying marketing and earning an associates degree in that field. She also worked approximately three days a week for an employer who paid her what was then the minimum wage of $4.50 per hour. Ms. Turnley had completed twelve credits toward her associates degree, and regardless of her part-time employment, she was taking twelve more credits toward her degree. She received a $900 grant, but it was paid directly to the community college where she was enrolled. Ms. Turnley's program of study was so arranged that she could pursue a bachelor's degree in marketing after she graduated from the Gulf Coast Community College.
¶ 25. The Turnleys' daughter, Jena, was also a full time student in her freshman year *1266 at the same community college. Ms. Turnley paid rent for the home into which her children and she had moved at the rate of $550 per month. Both her husband's natural father and Ms. Turnley's mother assisted her financially by paying some of Jena's tuition and some of Ms. Turnley's monthly bills. The Turnleys' son was attending high school.
¶ 26. In his findings of fact, the chancellor noted that while Melody had a high school education, she had no type of specialized training. About whether Ms. Turnley was guilty of "the wasteful dissipation" of the weekly sums of $300 paid by the insurance company to compensate Mr. Turnley's permanent disability, the chancellor concluded that "[t]he Court cannot say that the assets, such as the insurance checks received by Ms. Turnley, were in fact wasted." The chancellor continued, "She has given a reasonable explanation concerning her living expenses." About Mr. Turnley's ability to pay alimony, the chancellor found that he "ha[d] only a slight ability more than the wife because of his income from insurance and Social Security." The chancellor opined, "This situation would be different if [Ms. Turnley] had the ability, skill and work experience to work full-time at a job paying more than minimum wage." Based upon these findings of fact, the chancellor awarded Ms. Turnley "periodic rehabilitative alimony in the amount of $150.00 per month" to continue either until Ms. Turnley remarried or until August 7, 1999, the termination date for Mr. Turnley's disability insurance benefits, "whichever shall occur first."

4. Resolution of the second issue
¶ 27. Periodic rehabilitative alimony is one form of alimony that a chancellor may award a spouse in order to equalize the parties' financial situations. See Hubbard, 656 So.2d at 129-30 (distinguishing periodic alimony, lump sum alimony, and rehabilitative periodic alimony). "`Rehabilitative periodic alimony' is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim." Hubbard, 656 So.2d at 130. An award of this type is modifiable, unlike lump sum alimony. Id. at 129. Rehabilitative periodic alimony lasts only for a fixed period of time and vests as it accrues. Id. at 130.
¶ 28. This Court is aware that the Mississippi Supreme Court has defined twelve factors worthy of consideration in an appellate court's determination of whether an award of alimony was erroneous.[3] However, our review of Mr. Turnley's argument offered in support of his second issue demonstrates that he predicates the chancellor's error primarily on the eleventh factor, wasteful dissipation of assets by Ms. Turnley, and the second factor, the health and earning capacities of both Mr. and Ms. Turnley. We noted that the chancellor could not say that Ms. Turnley had wasted Mr. Turnley's disability payments and that Ms. Turnley had given a reasonable explanation concerning her living expenses. Relevant to the second factor was the chancellor's finding that Mr. Turnley had "only a slight ability more than the wife [to *1267 pay alimony] because of his income from insurance and Social Security."
¶ 29. Ms. Turnley's efforts to improve her work skills by returning to collegiate study after nearly two decades of serving Mr. Turnley and their two children in the Turnleys' home as Mr. Turnley wished justified the chancellor's awarding her rehabilitative alimony. In compliance with our standard of review, this Court finds that the chancellor's findings of fact were not against the overwhelming weight of the evidence. Thus, this Court will not reverse the chancellor's decision contained in the judgment of divorce to award Ms. Turnley rehabilitative alimony, and this Court affirms the chancellor's award.

IV. CONCLUSION
¶ 30. Because the chancellor found that Ms. Turnley was unaware that her authority as her husband's attorney-in-fact had been revoked until after she failed to receive the weekly disability benefit check for the week of January 29, 1993, Robertson becomes this Court's authority to affirm the chancery court's denial of Mr. Turnley's claim that Ms. Turnley reimburse him for the disability benefits which he alleged Ms. Turnley had misappropriated in the amount of $18,900. This Court further affirms the chancery court's award of rehabilitative alimony to Ms. Turnley because we find that such an award was not against the overwhelming weight of the evidence and that the chancellor applied the correct principles of law when he determined that she was an appropriate recipient of such rehabilitative alimony as we have explained.
¶ 31. THE JUDGMENT OF DIVORCE OF THE JACKSON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and DIAZ, HERRING, HINKEBEIN, KING, PAYNE, and SOUTHWICK, JJ., concur.
NOTES
[1] Ms. Turnley testified that each child received $253 per month, but that the Social Security Administration stopped paying her daughter's benefit in June 1996, because she became eighteen years old the next month. Her son continued to receive $253 per month, although she anticipated that after the chancery court granted a divorce to either her husband or her, her benefit would also stop and her son would then receive approximately $490 per month.
[2] Section 87-3-113 of the Mississippi Code, which did not become effective until from and after July 1, 1994, reads:

As to acts undertaken in good faith reliance thereon, an affidavit executed by the attorney in fact under a power of attorney, durable or otherwise, stating that he did not have at the time of exercise of the power actual knowledge of the termination of the power by revocation ... is conclusive proof of the nonrevocation or nontermination of the power at that time.
Miss.Code Ann. § 87-3-113 (Supp.1998). This section seems to codify the Robertson principle, but it was not the law during the period of controversy in this case, which ended January 29, 1993, when the insurance company discontinued sending its checks to Ms. Turnley.
[3] The twelve factors are:

1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.
Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993); Anderson v. Anderson, 692 So.2d 65, 70 (Miss.1997); see also Tilley, 610 So.2d at 353 (citing Brabham v. Brabham, 226 Miss. 165, 176, 84 So.2d 147, 152 (1955)); Brooks v. Brooks, 652 So.2d 1113, 1122 (Miss.1995); Crowe, 641 So.2d at 1102 (listing only five considerations but including the payment of insurance as another factor to be examined).