2 So.3d 720 (2009)
Ronald RODRIGUEZ, Appellant/Cross-Appellee
v.
Anne RODRIGUEZ (Armstrong), Appellee/Cross-Appellant.
No. 2007-CA-00132-COA.
Court of Appeals of Mississippi.
January 20, 2009.
*723 Michael P. Younger, attorney for the appellant.
William R. Wright, W. Benton Gregg, Jackson, Trhesa Bryan Barksdale, attorneys for appellee.
EN BANC.
KING, C.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. This appeal stems from a judgment entered by the Rankin County Chancery Court granting Anne Rodriguez (Anne) a divorce from Ronald Rodriguez (Ronnie) on the ground of uncondoned adultery. On January 7, 2006, Anne secretly recorded a conversation between herself and Ronnie. She repeatedly asked if he had an affair with another woman. After much probing, Ronnie admitted to having two affairs early in their marriage. He claimed that one of the women had been from Jackson and the other from New Orleans. This recording was admitted into evidence, during the hearing on September 22, 2006, along with a series of diary entries Anne had kept during the days surrounding this confrontation. These entries purported to document Ronnie's multiple attempts at asking for forgiveness  bringing up such things as Jesus forgiving an adulterer on the cross and women they knew personally forgiving their own husbands for adultery. After hearing testimony from both Anne and Ronnie, along with portions of the tape, and seeing the diary entries, the chancellor found that grounds for divorce existed based on uncondoned adultery. He issued the judgment for divorce on December 12, 2006.
¶ 2. Also on December 12, 2006, the chancellor heard testimony from Anne and Ronnie regarding the marital estate, the amount of alimony requested, and attorneys' fees. Ronnie and Anne stipulated that they would split the marital estate equally. Anne requested $900 a month in periodic alimony and asked for an award of her remaining attorneys' fees which equaled $6,709.20. After the December 12 hearing, at the chancellor's behest, counsel for both parties submitted competing, proposed findings of fact and conclusions of law. The chancellor then adopted, verbatim, Ronnie's proposed property division. This order and opinion, which was released on December 12, 2006, included roughly equal division of the marital estate with Ronnie receiving slightly more out of certain accounts and Anne receiving $300 a month in periodic alimony. Both parties were ordered to pay their own attorneys' fees.
¶ 3. Ronnie and Anne both filed their notices of appeal with the Chancery Clerk of Rankin County on January 22, 2007. Ronnie challenged the sufficiency of the *724 evidence in awarding the divorce based upon adultery. Anne challenged the division of assets, amount of alimony, and denial of attorneys' fees as ordered by the chancellor through his adoption of Ronnie's proposed order and opinion. Finding no error, we affirm the chancellor's decisions.

ISSUE ON APPEAL

WHETHER THE CHANCERY COURT ERRED IN GRANTING A DIVORCE BASED ON ADULTERY.
¶ 4. A chancellor is required to make specific findings of fact when a party alleges adultery as a ground for divorce. Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986). When these findings have been made, this Court will only set them aside if they are "manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Brooks v. Brooks, 652 So.2d 1113, 1117 (Miss.1995).
¶ 5. The supreme court has repeatedly held that "[a]dultery may be shown by evidence or by admissions and either are sufficient to support a decree of divorce." Id. at 1119 (quoting Jordan v. Jordan, 510 So.2d 131, 132 (Miss.1987)). Adultery can be proven through circumstantial evidence due to the inherently secretive nature of the acts involved. Holden v. Frasher-Holden, 680 So.2d 795, 798 (Miss.1996). In order to grant a divorce based upon circumstantial evidence there must be clear and convincing evidence of (1) "an adulterous inclination" and (2) a "reasonable opportunity to satisfy that inclination." Id. Evidence of inclination and opportunity must "be inconsistent with a reasonable theory of innocence." Id. Adultery can also be proven by direct proof in the form of the defendant's own admissions. See Davis v. Davis, 832 So.2d 492, 496(¶ 12) (Miss.2002) (wife "satisfied this burden when, on direct examination, [husband] admitted to the adulterous conduct").
¶ 6. This Court is reluctant to disturb the factual findings of a chancellor because of "[t]he credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." Rainey v. Rainey, 205 So.2d 514, 515 (Miss. 1967). The chancellor's factual findings are "insulated from disturbance on appellate review" if they are "supported by substantial credible evidence." McAdory v. McAdory, 608 So.2d 695, 699 (Miss.1992) (citing Jones v. Jones, 532 So.2d 574, 581 (Miss.1988)). However, we "may reverse a divorce decree based on adultery when the evidence is lacking." Lister v. Lister, 981 So.2d 340, 344(¶ 25) (Miss.Ct.App.2008). The evidence must rise above a mere suspicion or mere jealousy before this Court can accept the findings as sufficient. McAdory, 608 So.2d at 701 ("`Trifles light as air' may be sufficient to convince the jealous or the suspicious, but they do not impress the court with the same degree of credulity. Before accepting charges so seriously affecting the character of a person, the evidence must be clear and convincing.") (quoting Banks v. Banks, 118 Miss. 783, 788, 79 So. 841, 842 (1918)).
¶ 7. The chancellor found that Anne provided sufficient evidence to prove adultery through the presentation of the taped conversation and her supplemental diary entries. The chancellor deemed the tape to be a credible source and found that the statements made by Ronnie on the tape recording were truthful. On the tape, Ronnie swears that he had sex with "only those two." He informs Anne that the affairs were with a woman in New Orleans and another from Jackson. He claims that *725 he did not remember their names, but he had intercourse with each of the women more than once. These admissions are supplemented by Anne's diary entries which detail Ronnie's multiple requests for Anne's forgiveness. The tape recording and the diary entries sufficiently support the chancellor's finding that Anne proved the adultery by clear and convincing evidence. Finding that the evidence presented met the clear and convincing standard required for adultery, there was no abuse of discretion by the chancellor. Because this Court finds that the chancellor did not manifestly err in his findings of fact or conclusions of law regarding the grounds for divorce, we must affirm his decision to grant Anne the divorce based upon uncondoned adultery.

ISSUES ON CROSS-APPEAL

I. WHETHER THE CHANCERY COURT ERRED IN THE MANNER IN WHICH IT DISTRIBUTED THE MARITAL ASSETS.
¶ 8. "This Court employs a limited standard of review of property division and distribution in divorce cases." Bowen v. Bowen, 982 So.2d 385, 393(¶ 32) (Miss.2008) (quoting Owen v. Owen, 928 So.2d 156, 160(¶ 10) (Miss.2006)). The chancellor's distribution of the marital assets will be affirmed as long as "it is supported by substantial credible evidence." Id. at 394. We will not overturn a decision of the chancellor "even if this Court disagrees with the lower court on the finding of fact and might [arrive] at a different conclusion." Id.
¶ 9. When ruling on the distribution of marital assets, the chancellor must make certain findings regarding the application of the factors set out in Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). Ronnie and Anne entered into a stipulation on December 12, 2006, which stated that the chancery court would "proceed with its financial inquiries in this cause as if the Court's analysis of equitable distribution under Ferguson ... had resulted in a finding that the marital estate should be divided equally."
¶ 10. After the hearing on December 12, 2006, the parties' respective counsel(s) submitted competing, proposed findings of fact and conclusions of law. Ronnie's proposal was adopted verbatim by the chancellor as the equitable division of the marital estate. The supreme court has stated that "whether a trial court may adopt verbatim, in whole or in part, the findings of fact and conclusions of law of a party is within the court's sound discretion." Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1266 (Miss.1987). When a chancellor does adopt, verbatim, the proposed findings of fact and conclusions of law prepared by a party, this Court "analyzes such findings with greater care and the evidence is subjected to heightened scrutiny." Gutierrez v. Bucci, 827 So.2d 27, 31(¶ 13) (Miss.Ct.App.2002) (quoting Brooks, 652 So.2d at 1118). The findings will be viewed with a more critical eye than if the chancellor had made independent judicial findings of fact and conclusions of law. Rice Researchers, 512 So.2d at 1265. "Where the chancellor has failed to make his own findings of fact and conclusions of law, this Court will `review the record de novo.'" Holden, 680 So.2d at 798 (citing Brooks, 652 So.2d at 1118). This will ensure that the chancellor has adequately performed his judicial function and made decisions regarding the facts of the case because he is the one who can most fairly make decisions based upon the credibility of the evidence as a whole. Rice Researchers, 512 So.2d at 1265. Thus, we will analyze the record under the Ferguson factors to ensure that the chancellor was not manifestly wrong in his *726 adoption of Ronnie's proposed property division. See Ferguson, 639 So.2d at 928.

1. Substantial contribution to the accumulation of the property.
¶ 11. The three sub-factors that should be considered in determining the parties' contributions are:
(a) direct or indirect economic contribution to the acquisition of the property; (b) [c]ontribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and (c) [c]ontribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
Id. In determining the contributions of each spouse, it is imperative to remember that a spouse working inside the home as a homemaker will be presumed to contribute equally as the wage-earning spouse. Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994).
¶ 12. Ronnie was the primary breadwinner for the family, while Anne worked within the home for the majority of their thirty-seven-year marriage. Ronnie and Anne both testified that Anne took care of the parties' two children, the marital home, and Ronnie while he worked full time. For this factor, it will be presumed that each party contributed equally to the accumulation of the marital estate.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise.
¶ 13. Anne withdrew considerable amounts of money from their joint checking account upon the parties' separation. She spent $36,323.49 while awaiting the divorce hearing on what she deemed to be reasonable living expenses. This withdrawal was properly taken into account during the final calculation of property division. She was allowed to keep the remainder of the monies she withdrew with no requirement to pay those monies back to the marital estate. Some of the dissipated amount was credited to her through property division, which is proper. See Buckley v. Buckley, 815 So.2d 1260, 1265(¶ 30) (Miss.Ct.App.2002). There is no evidence of prior distribution of assets by agreement. The dissent points out that marital property continues to accumulate and, absent a separate maintenance or temporary support order, the legitimate spending of marital assets is not wasteful dissipation of marital assets. See Barnett v. Barnett, 908 So.2d 833, 841(¶ 17) (Miss.Ct.App.2005); Pittman v. Pittman, 791 So.2d 857, 865(¶ 22) (Miss. Ct.App.2001); Turnley v. Turnley, 726 So.2d 1258, 1266 (Miss.Ct.App.1998). We acknowledge this precedent, but we also note that, in the current case, the chancellor instructed Anne to only spend $5,000.[1] At no point, according to the evidence found in the trial record, did Anne attempt to file for any type of temporary support or separate maintenance. Nor is there any evidence that she attempted to find any type of employment. Even if the chancellor's estimate on how much she would need to survive was overly conservative, it was not within Anne's discretion to spend over seven times that amount without further approval from the chancellor. The more appropriate remedy would have been to petition the chancery court for separate maintenance. See Wilbourne *727 v. Wilbourne, 748 So.2d 184, 187-88 (¶¶ 7-8) (Miss.Ct.App.1999). As such, the finding that there was a wasteful dissipation of assets was not an abuse of the chancellor's discretion or manifestly erroneous.

3. The market value and the emotional value of the assets subject to distribution.
¶ 14. Anne and Ronnie both had emotional attachments to certain items of property. Anne wanted some of the antiques and gifts that she had received from family members. She wanted to give other antiques to the parties' children. Ronnie wished to keep his interest in the hunting camp, the camp-trailer located at the hunting camp, and the boat and boat trailer. The parties stipulated that the marital home would be sold and the proceeds divided equitably. The parties had many of the items appraised, such as the house, the household goods, and Anne's jewelry. These appraisal values and the party who especially wanted these items were taken into account during the division of the property as evidenced by the adopted order and opinion. The value of the house was divided equally, the household goods were distributed almost exclusively according to Anne's wishes, and Anne kept the jewelry given to her during the marriage. Ronnie was allowed to keep the camp, the camp-trailer, and the boat and boat trailer.
¶ 15. The dissent argues that it was error for the chancellor not to assign individual values to all property before equitably dividing the marital estate. However, our review of the order adopted by the chancellor and the trial court record show that the verbatim adoption of Ronnie's proposed findings also included the adoption of a majority of Anne's proposed division of the marital assets. There is no difference between what Anne proposed and what Ronnie proposed in the division of the assets concerning the hunting camp, the boat and boat trailer, and the camp-trailer. Both parties agreed that Ronnie should be awarded these assets. Also, the differing values that were assigned to the hunting camp, camp-trailer, and boat and boat trailer are not fatal to the property division. It has been repeatedly held that "an equitable division of property does not necessarily mean an equal division of property." Chamblee v. Chamblee, 637 So.2d 850, 863-64 (Miss.1994). The division must only be equitable and fair. Pierce v. Pierce, 648 So.2d 523, 526 (Miss.1994).
¶ 16. Ronnie incorporated Anne's proposed division of assets into his proposed and eventually adopted findings of fact with regard to all property except for some bank accounts. These contested accounts were assigned values and then divided equitably in the findings adopted by the chancellor. Thus, this case should not be remanded in order for the chancellor to assign values to properties when there was no dispute over how they should be divided. All of the disputed assets (the bank accounts) had a monetary value assigned to them. Even if we took Anne's proposed values as correct, the adopted division of the marital estate could be reasonably viewed as equitable.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse.
¶ 17. There was discussion of various inheritances that had been received during the marriage. Anne and Ronnie both testified that the money had gone to pay different things for the family, and none of the money was still in either of the parties' possession. The household goods that Anne had inherited from other family *728 members were divided according to Anne's proposals and adopted in Ronnie's proposed property division, which was, in turn, adopted by the chancellor.

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution.
¶ 18. There were no adverse tax or other economic consequences of the proposed distribution, nor were there any legal consequences to third parties that needed to be taken into account. The division order stated that the parties would be allocated one-half of the homestead exemption, and Ronnie would be allocated the mortgage interest deduction because he was paying the mortgage on the home until such time that it could be sold. The dissent again disagrees with the chancellor on this factor. However, there was neither any proof offered at trial nor any argument by either party that the tax treatment was unfair. See Owen, 928 So.2d at 163. Allowing Ronnie to enjoy the tax break while he pays the upkeep and mortgage on the house is not unfair. The fact that he is also living in the home does not change this. Because he had been paying the mortgage and all upkeep costs on the property, as well as all taxes and insurance, it is equitable for him to enjoy the interest deduction on the marital home until such a time when it could be sold and the proceeds divided equally as found in the property division order.

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties.
¶ 19. The equitable distribution of the marital home and all assets including the various bank accounts will allow each party to have a reasonable existence without the need for substantial alimony. The equitable distribution of the marital estate will eliminate the need for lump-sum alimony or substantial periodic alimony. Some alimony is appropriate as the earning capacity of the parties is unequal, which is discussed below in the examination of the alimony award. The dissent suggests that the chancellor should reconsider the division of property under Ferguson and then consider, under the Armstrong factors, whether Anne suffers a deficit justifying alimony. However, we find that there is no problem with the way the chancellor originally divided the marital estate; thus, the alimony should not be reconsidered for this factor as it was equitable under the chancellor's original property division.

7. The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity.
¶ 20. At the time of trial, both parties were nearing retirement age. Ronnie had already retired from his career and was working for the Courthouse Racquet Club. Anne testified that she was willing to go back to work. Both stated, at the divorce hearing, that they were in good health. Their good health and ability to work, in combination with the liquidation of the marital home and the division of the various bank accounts, will allow the parties to each have reasonable financial security.

8. Any other factor which in equity should be considered.
¶ 21. No other factors are necessary for consideration under this analysis. The dissent claims that Ronnie's infidelities should have been taken into consideration when dividing the property. "Marital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." Carrow v. Carrow, 741 So.2d 200, 203(¶ 20) (Miss.1999). It *729 does not appear from the trial transcript that Ronnie's adultery placed such a burden on the stability and harmony of the marital and family relationship that the chancellor was bound to consider the adultery in the equitable distribution. The facts of this case reveal that the complained of affairs had happened many years ago, during the beginning of the couple's marriage, and the affairs had not, in any way, interrupted the family relationship. Both parties had equally participated in the marriage and child rearing either through work or household duties. Ronnie had not been absent from the family in order to pursue the adulterous relationships. This is much different than the case of Watson v. Watson, 882 So.2d 95, 108 (¶¶ 67-68) (Miss.2004), where the court noted that the husband's adulterous affair was not a:
"slip-up," peccadillo, or occasional indiscretion. He moved out of the marital home he had shared with his wife for twenty years, and began an open, continuous, adulterous affair. He began to invest his time, society, companionship and assets into the nurturing and development of another home leaving [the remaining spouse] to her own emotional survival. This is the stuff of "marital fault" which led the [supreme] court to reverse the chancellor for dividing the marital property equally, a division which obviously placed "minimal weight" upon fault. The central question is whether the adulterous conduct "impacted and burdened the stability and harmony of the marriage."
(Citing Singley v. Singley, 846 So.2d 1004, 1009(¶ 13) (Miss.2004)).
¶ 22. While it is true that Anne testified that the admission of the affair led to the actual end of the marriage, it was not of such a nature that a failure to expressly consider it in the application of the Ferguson factors was a manifest error. See Ory v. Ory, 936 So.2d 405, 413(¶ 23) (Miss.Ct. App.2006) (holding that it was not error for the chancellor to not expressly consider, on the record, the adultery of one party when dividing up the marital estate). Finally, it must be remembered that the parties agreed to an equal split of the property. Anne entered into that stipulation knowing of the adultery.
¶ 23. By looking at the factors mandated under Ferguson, it is clear that an equal division of property, as stipulated by the parties, was appropriate in this case. Ronnie's proposed division of marital property distributed the assets fairly and equitably. It awarded Anne reasonable alimony and divided most assets in a way that each party was gaining about half of the marital estate. Ronnie's division compensated for the monies that Anne had removed from the marital estate when the parties separated, but it was otherwise an equal division of the marital assets.
¶ 24. After our de novo review of the trial court record through the lens of the Ferguson factors, it is apparent that the chancellor neither committed manifest error nor abused his discretion in the manner or method in which he divided the marital estate. The parties stipulated to an equal division of the marital assets, and the parties received an equal division of those assets with the inclusion of alimony for Anne and accounting for the dissipation of marital funds by Anne. Thus, we affirm the judgment of the chancery court.

II. WHETHER THE CHANCERY COURT ERRED IN THE AMOUNT OF ALIMONY AWARDED.
¶ 25. The chancery court awarded, through the adoption of Ronnie's proposed order, alimony to Anne in the amount of $300 per month. We have already deemed the adoption of Ronnie's *730 proposed order to be permissible. Anne does not challenge the award of alimony only the amount awarded. Anne requested an award of $900 per month during the divorce hearing.
¶ 26. This Court will not disturb a chancellor's findings regarding the award or amount of alimony unless there is manifest error. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993) (citing Powers v. Powers, 568 So.2d 255, 257-58 (Miss.1990)). In a case such as this, where the recipient of alimony claims an inadequate amount was awarded, we will overturn the chancellor only when the decision is seen as "so oppressive, unjust or grossly inadequate" as to demonstrate an abuse of discretion. Id. (citing McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987)).
¶ 27. This deferential standard is subject to heightened scrutiny if there is a verbatim adoption of one party's proposed order. Brooks, 652 So.2d at 1117. The verbatim adoption of one party's proposed findings of fact must be viewed with a more critical eye than if the chancellor made his own independent findings. Rice Researchers, 512 So.2d at 1266. The chancellor must consider the twelve factors identified in Armstrong in order to determine the proper amount of permanent alimony. The goal is to balance the reasonable needs of the spouse receiving alimony with the right of the paying spouse to lead as normal a life as possible. Curtis v. Curtis, 796 So.2d 1044, 1051(¶ 33) (Miss.Ct. App.2001) (quoting Gray v. Gray, 562 So.2d 79, 83 (Miss.1990)). All twelve of these factors do not have to be considered in every case for this Court to affirm the chancellor's holding. Voda v. Voda, 731 So.2d 1152, 1155(¶ 11) (Miss.1999). If the chancellor fails to make on-the-record findings of fact regarding the Armstrong factors, the case does not have to be remanded as long as there are sufficient facts available for an equitable determination to be made. Roberson v. Roberson, 949 So.2d 866, 869(¶ 6) (Miss.Ct.App.2007) (citing Holcombe v. Holcombe, 813 So.2d 700, 704(¶ 12) (Miss.2002)). This Court will presume that all the Armstrong factors were considered by a chancellor when he has awarded alimony to a party. Id.
¶ 28. A lack of an on-the-record consideration of the Armstrong factors will only be reversed on appeal if "it appears that the chancellor's failure to make findings of fact and corresponding conclusions of law constitutes manifest error." Id. To determine if manifest error exists in the present case, we will review all of the facts and apply the Armstrong factors on review.

1. Income and expenses of the parties.
¶ 29. Ronnie claimed in his 8.05 financial disclosure that his total monthly income was $4,046, which included monies from his current job at the Courthouse Racquet Club, pensions and retirement accounts, social security benefits, and dividend income. He also claimed that he has expenses of approximately $4,568 a month. Anne claimed in her 8.05 financial disclosure that she had no monthly income.[2] She also stated on her 8.05 that she had approximately $2,592 in monthly expenses not including unknowns such as property insurance, utilities, and automobile-related expenses including insurance and note payments. At the divorce hearing, she submitted an approximate calculation of the monies spent over the ten-month period awaiting the divorce proceedings. *731 These expenses (not including the $21,314.49 she spent in attorneys' fees), when broken down into a per month figure, totaled approximately $1,602.97 a month. This ten-month period included only $200 a month in rent because she lived with her daughter. She estimated in her 8.05 statement that rent would be near $1,500 per month when she began living on her own. Adding the $1,500 dollars anticipated rent to the $1,602.97 average she spent in the ten months preceding the hearing, Anne's monthly expenses would be approximately $3,000 dollars a month.

2. Health and earning capacity of the parties.
¶ 30. Both parties are in good health and capable of work. Anne only has a high school degree and little work experience. Ronnie is retired and works at the Courthouse Racquet Club making approximately $550 per month.

3. Needs of each party.
¶ 31. No special needs are apparent from the record for either party besides the needs specified under the expenses of each party's 8.05 financial statement.

4. Obligations and assets of each party.
¶ 32. The Rodriguezes' assets at the time of the trial included: a home appraised at $630,000, a hunting club, a 2001 Ford truck, a 2001 Cadillac, a Fleetwood camp-trailer, a 26' deck boat, various guns, household goods, a four-wheeler, two riding lawnmowers, and several checking, savings, pension, and IRA accounts. The chancery court divided these assets equitably, as detailed above. Anne was to take over the payments on the Cadillac; Ronnie would pay for the Ford truck and the interest in the hunting club. He was also responsible for the home mortgage until the home was sold and the proceeds could be divided equally between the parties.

5. Length of the marriage.
¶ 33. The parties were married for thirty-seven years.

6. Presence or absence of minor children in the home.
¶ 34. The parties have two grown, emancipated children.

7. Age of the parties.
¶ 35. At the time of trial, Ronnie was almost sixty-three years of age. Anne was fifty-nine years old.

8. Standard of living during the marriage and at support determination.
¶ 36. The parties maintained a comfortable existence. They owned a home on the water at the Ross Barnett Reservoir, sent their children to private schools and college, and never wanted for clothes or food. Their income obviously had shrunk due to Ronnie's retirement, but the parties shared numerous pensions, savings accounts, IRAs, and bank accounts. At the time of the support determination, Ronnie was still residing in the marital home and stated that he had touched none of the marital funds. He testified that all the monies he received every month went to pay the bills associated with the house and other expenses. Anne was living with her daughter, and had been since the separation, but she expressed a desire to rent or buy a small house in the area. She testified that she deemed all the money she spent since the separation as reasonable.

9. Tax consequences of the spousal support order.
¶ 37. Both parties would be responsible for their tax obligations, and Anne's taxable income would be increased by the amount of the alimony awarded. Ronnie's taxable income would be reduced by the amount of the alimony awarded.

10. Fault or misconduct of the parties.
*732 ¶ 38. Anne was granted a divorce on the grounds of uncondoned adultery from Ronnie.

11. Wasteful dissipation of the assets by either party.
¶ 39. Anne spent $36,323.49 out of the marital estate while awaiting the divorce proceeding. The chancery court had only authorized her to spend $5,000 on living expenses. This money was taken out of various joint accounts during the couple's separation. This can reasonably be viewed as a dissipation of marital assets by Anne.

12. Other equitable factors.
¶ 40. The record suggests no other relevant factors for consideration.
¶ 41. After considering the twelve factors and the corresponding facts found in the trial court record, it is clear that the chancellor was neither manifestly wrong nor did he abuse his discretion when he awarded Anne only $300 a month in periodic alimony. The award was not oppressive, unjust, or grossly inadequate. Even with the higher level of scrutiny due to the verbatim adoption of Ronnie's proposed order, this alimony award was reasonable, especially in light of Anne's receipt of nearly half of the marital estate.

III. WHETHER THE CHANCERY COURT ERRED IN THE DENIAL OF ATTORNEYS' FEES.
¶ 42. The standard of review for overturning an award or denial of attorneys' fees is abuse of discretion. Voda, 731 So.2d at 1157(¶ 29) (citing Johnson v. Johnson, 650 So.2d 1281, 1288-89 (Miss. 1994)). "In order for this Court to say that the chancellor has abused his discretion, there must be insufficient evidence to support his conclusions." Mabus v. Mabus, 910 So.2d 486, 488-89(¶ 7) (Miss.2005).
¶ 43. An award of attorneys' fees is "justified where the equities suggest one party should assist the other, and the other party is unable to pay." Haney v. Haney, 907 So.2d 948, 957(¶ 41) (Miss. 2005) (citing Brooks, 652 So.2d at 1120). The party requesting attorneys' fees must prove an inability to pay. Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss.1992) (citing Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991); Martin v. Martin, 566 So.2d 704, 707 (Miss.1990)). An inability to pay could be created if one party would be forced to liquidate a portion of their retirement or savings accounts in order to pay attorneys' fees. Wells v. Wells, 800 So.2d 1239, 1246 (¶¶ 16-17) (Miss.Ct.App.2001).
¶ 44. Anne did not prove an inability to pay her attorneys' fees. She has sufficient liquidated funds including the cash she withdrew from various accounts upon the couple's separation to make the required payments. She has already managed to pay $21,314.49 of the total $28,023.69 that she owed. She testified in court that she was willing to return to the work force. She will be receiving a substantial sum of money upon the sale of the marital home, and she was awarded a checking account with over $20,000 in it. Anne was also awarded the more than $12,000 in cash that was in her possession at the time of the divorce hearing. These funds are sufficient enough for Anne to pay the remaining $6,709.20 in attorneys' fees and still have ample resources on which to live. The dissent claims that this issue should also be reconsidered on remand because the property division should be reconsidered. Because we do not find that the property division was in error, we also do not find that the chancellor abused his discretion in declining to award Anne's attorneys' fees. Therefore, this issue is without merit.

CONCLUSION
¶ 45. We find no error in the chancellor's decisions on any issues raised herein. *733 Accordingly, we affirm the judgment of the chancery court.
¶ 46. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT/CROSS-APPELLEE AND THE APPELLEE/CROSS-APPELLANT.
LEE AND MYERS, P.JJ., IRVING, BARNES, ISHEE, AND ROBERTS, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.
CARLTON, J., Dissenting.
¶ 47. I respectfully dissent from the majority's opinion on two grounds. First, I submit that the chancellor abused his discretion when he failed to set forth findings of fact and conclusions of law when he adopted verbatim Ronnie's proposed order because the parties disputed what constituted a 50/50 split. Second, the record conveys that the chancellor misapplied the governing law under Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994) in distributing the Rodriguezes' marital property, specifically, Anne's use of marital assets for living expenses pending their divorce.
¶ 48. I submit that the record fails to contain sufficient facts for the Court to rely on any implied findings supporting the portion of the chancellor's decision regarding the couple's use of marital assets pending their divorce and its effect on final distribution. In utilizing either a heightened or de novo standard of review, I submit that the Court should remand this case to the chancellor to set forth findings of fact and conclusions of law as to what constituted reasonable living expenses or unreasonable dissipation of marital assets by the parties so that the equity of the chancellor's division may be appropriately reviewed.

I. The chancellor abused his discretion in adopting verbatim Ronnie's proposed order without making findings of fact and conclusions of law to support his decision.
¶ 49. Marital property consists of those assets acquired and accumulated during the marriage which are subject to equitable distribution by the chancellor. Berryman v. Berryman, 907 So.2d 944, 947(¶ 13) (Miss.2005) (citing Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994)). In Ferguson, the supreme court created a list of factors that chancellors are to use as a guideline to create a fair division of marital property. Ferguson, 639 So.2d at 928. These include the following factors:
1. [A spouse's] substantial contribution to the accumulation of marital property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family, duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and emotional value of assets subject to distribution.

*734 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse[.]
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution[.]
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties[.]
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity[.]
8. Any other factor which in equity should be considered.
Id. Not only are chancellors directed to use the Ferguson factors, they are also directed to support their decisions with findings of fact and conclusions of law for the purpose of appellate review. Id.
¶ 50. Generally, this Court will not reverse findings of fact made by a chancellor when those findings are supported by substantial credible evidence in the record. Tricon Metals & Servs., Inc. v. Topp, 516 So.2d 236, 238 (Miss.1987). In reviewing a chancellor's judgment, this Court does not conduct a new Ferguson analysis. Spahn v. Spahn, 959 So.2d 8, 12(¶ 12) (Miss.Ct. App.2006). Rather, the Court's duty is to review the chancellor's decision under an abuse of discretion standard. Gray v. Gray, 909 So.2d 108, 110(¶ 7) (Miss.Ct. App.2005).
¶ 51. When there are no findings of fact to review from the chancellor's decision, the Court can invoke the doctrine of implied findings. See Tricon Metals, 516 So.2d at 238. In such a situation, the Court assumes that the chancellor made "determinations of fact sufficient to support the judgment." Pace v. Owens, 511 So.2d 489, 492 (Miss.1987) (citing Rives v. Peterson, 493 So.2d 316, 317 (Miss.1986)). However, "[u]se of the implied findings doctrine ... is not always possible" when the court does not "have ... enough help from the [chancellor]" to "derive the findings [he] ought to have made." Tricon Metals, 516 So.2d at 238 (quoting Pace, 511 So.2d at 492).
¶ 52. Our Court gives great deference to a chancellor's judgment "because [the chancellor] is in a better position to determine what action would be fair and equitable in the situation than a court of appellate jurisdiction." Turnley v. Turnley, 726 So.2d 1258, 1265(¶ 23) (Miss.Ct.App.1998) (citation omitted). Generally, the place for initial fact finding is in a trial court, not the appellate court. See Educational Placement Servs. v. Wilson, 487 So.2d 1316, 1320 (Miss.1986).
¶ 53. It is within a chancellor's sound discretion to adopt verbatim the findings of fact and conclusions of law submitted by a party. Thomas v. Scarborough, 977 So.2d 393, 396(¶ 9) (Miss.Ct.App.2007) (citation omitted). However, "[w]here the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party ... this Court analyzes such findings with greater care and the evidence is subjected to heightened scrutiny." Gutierrez v. Bucci, 827 So.2d 27, 31(¶ 13) (Miss.Ct.App.2002) (quoting Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995)).
¶ 54. The problem with adopting a party's findings verbatim is "that these findings simply are not the same as findings independently made by the trial judge after impartially and judiciously sifting through the conflicts and nuances of the case." Thomas, 977 So.2d at 396(¶ 9). *735 Moreover, this Court has held that it is error for a chancellor to adopt a party's proposed findings when the evidence does not reasonably support the chancellor's findings. Id.
¶ 55. For example, in Gray, 909 So.2d at 111 (¶¶ 11-12), the supreme court reversed and remanded a case when it found that the chancellor provided neither any Ferguson analysis nor any explanation for his decision and merely announced his judgment, divided the property, and awarded alimony. Similarly, in Sandlin v. Sandlin, 699 So.2d 1198, 1204 (Miss.1997), the supreme court reversed and remanded a case in which it found that the court "could not evaluate the basis that [the chancellor had] used to determine the division of property." I respectfully submit that since no agreement existed between Ronnie and Anne as to what constituted a 50/50 split, the chancellor abused his discretion in adopting Ronnie's order without making his own findings in support of his decision. See Sandlin, 699 So.2d at 1204; Tricon Metals, 516 So.2d at 239; Snoddy v. Snoddy, 791 So.2d 333, 338(¶ 17) (Miss. Ct.App.2001); Forsythe v. Akers, 768 So.2d 943, 947(¶ 9) (Miss.Ct.App.2000); Gray, 909 So.2d at 111(¶ 12). Therefore, I submit that this case should be remanded to the chancellor to reflect his findings regarding whether a 50/50 split or an equitable result was achieved when he distributed the Rodriguezes' property as he did.
¶ 56. A de novo review is warranted in a case where the chancellor adopts one party's findings and misapplies the law. Brooks, 652 So.2d at 1118. I submit that the chancellor in this case, like the chancellor in Brooks, erred when he failed to make his own findings and, as discussed further under Section II below, apparently misapplied the law with respect to the dissipation of marital assets and reasonable living expenses. Therefore, as in Brooks, I submit that this case warrants a de novo review.

II. The chancellor misapplied the law under Ferguson when he distributed the Rodriguezes' marital assets.
¶ 57. I submit that the chancellor erred when he failed to make his own findings of fact and conclusions of law under the Ferguson factors. Without such findings or conclusions, it appears that the chancellor misapplied the law regarding the dissipation of assets and living expenses. Therefore, I review de novo chancellor's adopted findings. See Wilson v. Wilson, 811 So.2d 342, 344(¶ 6) (Miss.Ct.App.2001).

1. Contribution to Marital Property
¶ 58. I agree with the majority's opinion under this factor.

2. Disposition and Distribution of Marital Assets
¶ 59. The majority finds under this factor that Anne withdrew considerable amounts of money from the couple's joint accounts upon their separation and that Anne's withdrawal was properly taken into account during the final calculation of the property division. Ronnie contends in his brief that Anne had been authorized under a "gentleman's agreement"[3] that was reached in the presence of the chancellor to use up to $5,000 for living expenses pending their judgment of divorce.[4] In *736 contrast, Ronnie, who was receiving $4,046 in monthly income, was given no restrictions as to the amount of money he could spend.
¶ 60. Under our case law, ordinary and reasonable living expenses used during separation do not constitute a dissipation of marital assets. See Pittman v. Pittman, 791 So.2d 857, 865(¶ 22) (Miss.Ct. App.2001); see also Turnley, 726 So.2d at 1266(¶ 26). Additionally, marital assets are deemed to still be accumulating unless a separate maintenance order or temporary support order is entered. Marshall v. Marshall, 979 So.2d 699, 701(¶ 9) (Miss.Ct. App.2007) (citations omitted). Furthermore, this Court has stated that if there has been no maintenance or temporary support order entered, that neither party need consult the other before using marital assets for legitimate marital expenses. Barnett v. Barnett, 908 So.2d 833, 841(¶ 17) (Miss.Ct.App.2005).
¶ 61. For example, in Pittman, the Court stated that "if marital funds ... are used for legitimate expenses of both parties during a separation, the person who has been making the disbursements from the account does not [under the facts of this case] ... need to provide equivalent amounts of separate funds at the time of the actual divorce as part of a distribution of marital property." Pittman, 791 So.2d at 865(¶ 22).
¶ 62. Similarly, in Turnley, the Court affirmed the chancellor's judgment that the wife had not "wasted" her husband's $300 a month disability payments pending their divorce because she had used the payments to support herself and their children. Turnley, 726 So.2d at 1266(¶ 26). Because the wife had provided a reasonable explanation for the use of her husband's disability payments, the chancellor found that she was not required to reimburse her husband. Id.
¶ 63. Here, no maintenance or temporary support order was entered before the Rodriguezes' divorce. Moreover, Anne and Ronnie disagree on how much of the couple's joint marital funds Anne spent pending their divorce. Ronnie argues that Anne spent $36,323.49 from the time of their separation to their judgment of divorce ten months later.
¶ 64. Anne and Ronnie agree that Anne spent $21,314.49 on legal fees pending their divorce. Assuming Ronnie was correct about Anne spending $36,323.49, this means that Anne spent, on average, approximately $1,500 per month pending their divorce. In contrast, Ronnie received approximately $40,000 in income pending their divorce. The chancellor awarded an investment account of $52,300 to Ronnie "to offset the cash assets that [Anne] withdrew prior to the separation of the parties and spent during the course of [the] litigation." Because of this specific distribution, Ronnie was awarded $211,106 in account assets, and Anne was awarded $198,551 in account assets.
¶ 65. Since the chancellor did not provide any findings as to how much Anne or Ronnie spent pending their divorce and since there was no order of the court enforcing the "gentleman's agreement," I would remand the case for the chancellor to make findings of fact and conclusions of law regarding how much of the marital assets were spent by each party and whether such expenditures were reasonable. See Pittman, 791 So.2d at 864-65(¶ 21).

*737 3. Market and Emotional Value of Assets
¶ 66. Ronnie and Anne submitted differing market values for various assets. Specifically, the Rodriguezes' hunting camp, camp-trailer, and boat and boat trailer were assigned strikingly different values by Ronnie and Anne. The chancellor's opinion fails to reflect if the value of these items was determined or even considered in the final distribution of the property. In order to achieve an equitable division of assets, the fair market value of the assets should be considered before any allocation. See id. at 867(¶ 37).
¶ 67. In Wilson, the Court reversed the chancellor's judgment and remanded the case because he assigned several items to one party without assigning them any value. Wilson, 811 So.2d at 346(¶ 14). The Court stated that "some actual value should be assigned to [the items] to insure that the division [was] equitable." Id. at (¶ 13). I submit that this case should be remanded on this issue for findings of fact in accordance with the analysis set forth in Wilson. See also Aron v. Aron, 832 So.2d 1257, 1260 (¶¶ 14-16) (Miss.Ct.App.2002) (reversing and remanding so chancellor could make valuations of marital property in order to create an equitable distribution).

4. Value of Assets Not Ordinarily Subject to Distribution
¶ 68. I agree with the majority's opinion under this factor.

5. Tax Consequences of Distribution
¶ 69. The majority states: "Ronnie would be allocated the mortgage interest deduction because he was paying the mortgage on the home until such time that it could be sold." It appears that the majority assumed that the chancellor awarded Ronnie the deduction because he was paying the monthly mortgage payments. However, the chancellor's opinion contains no such analysis, similar or otherwise, regarding why Ronnie was to be awarded the mortgage deduction and not Anne. According to the record, Ronnie was paying $730 a month on the mortgage, and while doing so, he enjoyed the privilege of living in the marital home pending their divorce. At the same time, Anne was paying $200 a month in rent to her daughter.
¶ 70. Under Hemsley, a spouse working as a homemaker will be presumed to contribute equally as the wage-earning spouse. Hemsley, 639 So.2d at 915. In this case, Ronnie was the primary breadwinner, and Anne worked within the home for the majority of their thirty-seven-year marriage. Because there are no explicit or implicit findings in the chancellor's opinion as to why Ronnie received the entire deduction and because no agreement existed as to what constituted a 50/50 split, I would remand this case to the chancellor to make findings on this issue.

6. Alimony
¶ 71. "Upon remand, [a] chancellor must reconsider not only the issue of equitable distribution, but also the award[] of alimony ... after he has properly divided the marital assets" as directed by Ferguson. Lauro v. Lauro, 847 So.2d 843, 848(¶ 12) (Miss.2003). "If the situation is such that an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, then alimony based on the value of non-marital assets should be considered." Id. at (¶ 13) (citation omitted). In Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993), the supreme court set out twelve factors for the chancellor to consider in making an award of alimony.
¶ 72. I contend that this case should be remanded to the chancellor to reconsider the equitable distribution of the Rodriguezes' property under the Ferguson factors *738 and, upon doing so, consider the Armstrong factors in order to determine whether Anne suffers a deficit.

7. Needs of the Parties for Financial Security
¶ 73. I find that the case should be remanded for the chancellor to consider this issue after applying the Ferguson factors to the facts of the case. See Drumright v. Drumright, 812 So.2d 1021, 1025(¶ 9) (Miss.Ct.App.2001). The chancellor should then make findings of fact and conclusions of law supporting his decision under this issue.

8. Any Other Factors

a. Ronnie's Adultery
¶ 74. The Court has stated that marital misconduct is a proper factor for a chancellor to consider in the equitable distribution of marital property when the "misconduct places a burden on the stability and harmony of the marital and family relationship." Ory v. Ory, 936 So.2d 405, 413(¶ 23) (Miss.Ct.App.2006) (quoting Singley v. Singley, 846 So.2d 1004, 1007(¶ 8) (Miss.2002)). It is within the chancellor's discretion in this case to consider Ronnie's adulterous conduct and its impact, if any, on the destruction of the marriage. See Sullivan v. Sullivan, 990 So.2d 783, 788(¶ 19) (Miss.Ct.App.2008).

b. Attorney's Fees
¶ 75. Finally, Anne cross-appeals the chancellor's decision denying her an award of attorney's fees. It is within the chancellor's discretion to award attorney's fees. Spahn, 959 So.2d at 15(¶ 18). The chancellor should consider each party's financial ability when deciding whether to award attorney's fees. Id. Assets received as part of an equitable distribution can be considered in determining a party's ability to pay his attorney's fees. Hankins v. Hankins, 729 So.2d 1283, 1286(13) (Miss. 1999) (reversing and remanding for chancellor to consider the $210,000 award in equitable distribution in determining the party's ability to pay attorney's fees). Since I would remand this case for findings of fact and conclusions of law under Ferguson, I submit that the chancellor should also reconsider an award of attorney's fees in light of his Ferguson analysis. See Pittman, 791 So.2d at 870-71 (¶¶ 54-57).

CONCLUSION
¶ 76. I respectfully submit that the chancellor abused his discretion and apparently misapplied the law when he adopted Ronnie's proposed order verbatim without supporting Ferguson findings and conclusions of law because the parties did not reach an agreement as to what constituted a 50/50 split of the marital property. Without such findings, we cannot review whether sufficient evidence supports his decision. I recognize that due to crushing caseloads, trial courts must, at times, rely on party submissions. Thomas, 977 So.2d at 396(¶ 9). However, such reliance is error when the evidence does not substantially support the chancellor's findings. See id. For the above reasons, I would reverse and remand this case for findings of fact and conclusions of law under Ferguson.
GRIFFIS, J., JOINS THIS SEPARATE OPINION.
NOTES
[1] While there is no direct evidence of this agreement, there are references to the agreement in the trial record. For example, Anne was asked about a hearing in chambers where the chancellor suggested that she go ahead and use $5,000 for her expenses.
[2] Anne had been paying her living expenses out of the money she removed from the various accounts upon the couple's separation.
[3] It should be noted that the chancellor did not issue an order enforcing this "agreement."
[4] Under this "gentlemen's agreement," Anne would have been entitled to spend, on average, $500 a month in living expenses. Under federal poverty guidelines, an annual income of $10,400 for a household of one is considered the threshold of poverty level. U.S. Dep't of Health & Human Servs., 2008 DHS Poverty Guidelines of 2008, http://aspe.hhs. gov/poverty/08Poverty.shtml (last visited on January 7, 2009). In light of the federal poverty guidelines and the Rodriguezes' available assets, I submit that such an agreement was not equitable, reasonable, or fair.