# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00104-COA

**ARTHUR DEWAYNE BLACK**                                                      **APPELLANT**

**v.**

**ALICIA POWELL BLACK**                                                          **APPELLEE**

DATE OF JUDGMENT:            12/31/2014
TRIAL JUDGE:                        HON. G. CHARLES BORDIS IV
COURT FROM WHICH APPEALED:   JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      DEAN HOLLEMAN
ATTORNEYS FOR APPELLEE:      NITA LOUISE CHASE
                                    TANYA MITCHELL GRAHAM
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 AFFIRMED IN PART; REVERSED AND
                                    REMANDED IN PART - 11/07/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

       **EN BANC.**

       **BARNES, J., FOR THE COURT:**

¶1.     Arthur and Alicia Black were divorced in December 2014.  The Jackson County Chancery Court found the prenuptial agreement signed by the parties valid and enforceable, resulting in the marital estate being equitably distributed according to its terms.  The parties moved to have the final judgment set aside, altered, or amended, raising a variety of issues in the process.  Displeased with the chancery court's findings in its posttrial order, Arthur seeks relief from this Court regarding many of the same issues, including sanctions and attorney's fees, the chancellor's allocation of certain marital assets and debts, child-support and tuition payments, and visitation privileges.  Upon review, the judgment is affirmed in

part and reversed and remanded in part for further findings consistent with this opinion.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Arthur and Alicia were married on September 13, 2003.  Three days prior, on September 10, 2003, the parties executed a prenuptial agreement.[1]  Alicia left her career as an engineer in Atlanta, Georgia, to assist Arthur, an orthopedic surgeon, in building a medical practice in Mississippi, serving as the business's office manager.  The couple had two children, M.K.B., a female child, and A.D.B. II, a male child.[2]  Alicia was the primary caretaker of the children for the duration of the parties' marriage.  For the last two years of the parties' marriage, Alicia and the children resided in Mobile, Alabama, where the children attended private school.  The parties separated in May 2013, and Alicia and the children moved to Atlanta following the May 2014 school year, which is where they currently reside.

¶3.     On March 7, 2014, Alicia filed a pro se complaint for divorce alleging, among other things, uncondoned adultery.  Several days later, she filed an amended complaint with the assistance of counsel, acknowledging that the parties had entered into a prenuptial agreement, but asserting that the agreement was invalid because its terms were "unconscionable under the specific facts and circumstances of this case."  Were the agreement found to be invalid, she sought an equitable division of all marital assets, as well as alimony and attorney's fees. Arthur filed his answer, a motion for declaratory judgment as to the validity of the prenuptial

---

[1] The scope and terms of the prenuptial agreement will be addressed in the discussion section of this opinion, with all relevant portions discussed where needed.

[2] In the interest of privacy, we substitute initials for the names of the two minors involved in the case.

agreement, and a counterclaim for divorce and breach of contract.

¶4.     On June 17, 2014, the chancery court granted Alicia temporary physical custody of the children, and Arthur was ordered to pay temporary child support of $5,200 per month. He was also ordered to maintain the children's health insurance, pay the children's noncovered medical expenses, pay $30,000 toward the children's private-school tuition, and pay all financial obligations on all real properties owned by the parties. The chancery court set a demarcation date of May 2013 (the relevant date of the parties' separation), and set a hearing for August 2014 on the validity of the prenuptial agreement. A trial date of December 11, 2014, was also set by the court, after which the issue of Alicia's request for attorney's fees would be resolved.

¶5.     Alicia filed a motion for declaratory relief in July 2014, reasserting the invalidity of the parties' prenuptial agreement. She acknowledged, however, that the parties had executed the prenuptial agreement, including a ratification thereof, and that both parties had been represented by legal counsel in the drafting, assessment, evaluation, and execution of the agreement. Arthur requested sanctions and attorney's fees in light of Alicia's alleged frivolousness in attacking the agreement.

¶6.     On the day of the hearing on the validity of the agreement, Alicia filed a supplemental motion, vaguely attacking the agreement on grounds of invalidity and unconscionability, and requesting that the chancery court order Arthur to produce the original agreement. At the conclusion of the hearing, the chancellor determined that the parties voluntarily executed the agreement at a time when both parties were provided full disclosure of all assets prior to

3

execution of the agreement and that both were represented by very competent legal counsel. Accordingly, there was fairness in the execution of the agreement and the terms of the agreement were not unconscionable. The chancellor upheld the validity of the agreement, but denied Arthur's request for sanctions and attorney's fees. Aggrieved, Alicia filed a motion for reconsideration as to the validity of the agreement, and Arthur moved for reconsideration as to the denial of his request for sanctions and attorney's fees. Each party's request was denied by the court.

¶7.    After trial, the chancellor issued a final judgment on December 31, 2014, granting Alicia a divorce on the ground of Arthur's admitted adultery.[3] The parties were granted joint legal custody of the children, Alicia received physical custody and Arthur was awarded visitation privileges. The court ordered Arthur to pay child support of $6,500 per month, $36,000 annually towards the children's private-school tuition, as well as various other health-related expenses for the children. The chancellor determined that the marital estate possessed a total equity value of $2,211,050.75, and he divided the marital estate in accordance with the terms of the prenuptial agreement. Thus, Alicia was awarded $668,183.52, with the remainder of the estate to be awarded to Arthur. The chancellor also awarded Alicia $40,000 in attorney's fees in light of her inability to pay.

¶8.    In January 2015, both parties filed motions under Mississippi Rule of Civil Procedure 59 to have the judgment set aside, altered, or amended. Alicia sought, among other things,

---

[3] The Honorable G. Charles Bordis IV presided over all the parties' pretrial motions and hearings, as well as the parties' trial. Judge Bordis's tenure ended on December 31, 2014, however, and the Honorable Michael Fondren presided over the parties' posttrial motions.

to have the visitation-exchange times clarified and for the court to order Arthur to pay all sums originating from the December 2014 final judgment. Arthur requested to have a particular marital debt included in the equitable distribution of the parties' estate, as well as review of other matters, including child support and tuition costs, 2013 income-tax refunds, allocated assets, and attorney's fees. A June 2015 hearing was held, wherein the parties orally agreed to alteration of visitation privileges and reopened the record as to the income-tax returns. On December 17, 2015, the chancellor issued his posttrial order, and Arthur now appeals the order, citing several issues.

**STANDARD OF REVIEW**

¶9. Appellate courts are bound by a limited standard of review in domestic-relations matters. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994). In matters concerning "divorce, custody, and child support, we will 'respect a chancellor's findings of fact which are supported by credible evidence and not manifestly wrong.'" *Dorsey v. Dorsey*, 972 So. 2d 48, 51 (¶5) (Miss. Ct. App. 2008) (quoting *R.K. v. J.K.,* 946 So. 2d 764, 772 (¶17) (Miss. 2007)). Thus, a chancellor's findings will not be disturbed on appeal "unless the chancellor was manifestly wrong, clearly erroneous or a clearly erroneous standard was applied." *Id*. (quoting *Yelverton v. Yelverton,* 961 So. 2d 19, 24 (¶6) (Miss. 2007)). "[W]hen looking at a chancellor's division of property and assets, a 'chancellor's division and distribution will be upheld if it is supported by substantial credible evidence.'" *Id*. (quoting *Owen v. Owen,* 928 So. 2d 156, 160 (¶10) (Miss. 2006)). "For questions of law, our standard of review is de novo." *Shoffner v. Shoffner*, 909 So. 2d 1245, 1249 (¶11) (Miss. Ct. App. 2005).

5

**DISCUSSION**

## I.  Scope and Terms of the Prenuptial Agreement

¶10.  "The Mississippi Supreme Court has held that prenuptial agreements must be fair in the execution, and a duty of disclosure shall be imposed." *McLeod v. McLeod*, 145 So. 3d 1246, 1249 (¶12) (Miss. Ct. App. 2014).  "Prenuptial agreements are enforced like contracts: the first rule of interpretation of contracts is to follow the intent of the parties." *Id.* (citing *Long v. Long*, 928 So. 2d 1001, 1003 (¶14) (Miss. Ct. App. 2006)).

¶11.  The stated purpose of Arthur and Alicia's prenuptial agreement was to "fix and determine the rights accruing to each of them by reason of their marriage with respect to the property and estate of the other and with respect to the right of support of maintenance from the other."  The agreement acknowledged that each party had consulted with his or her respective attorney regarding the effect of the agreement.  Additionally, certain provisions of the agreement stated that each party was to "retain all rights in his or her own separate property," which encompassed real and personal property.  The agreement further stated:

> The interest of each in any property which they may together or separately acquire during the marriage shall be marital property, with [Arthur] to own seventy percent (70%) of all marital property of whatsoever kind or character and [Alicia] to own thirty percent (30%) of all said marital property, specifically excepting [Arthur's] medical practice or business.
>
> . . . .
>
> Except as otherwise expressly provided in this premarital agreement, each of the parties hereby waives and releases any and all rights in the real or personal property of the other . . . which may be assertable against the other at law or in equity, which he or she shall acquire by reason of marriage to the other, or which he or she shall have as a spouse of the other . . . [including] [a]ny right to receive support, temporary support, maintenance, separate maintenance, or

6

alimony from the other during the marriage or following the termination of the marriage.

The agreement also provided specific amounts of alimony based upon the duration of the parties' marriage, to be inclusive of "all types of temporary and permanent support." The chancery court found the agreement valid and enforceable in its entirety.

¶12.    With these provisions in mind, Arthur asserts that the chancellor: (1) erred in denying his request for sanctions and attorney's fees; (2) failed to adhere to terms of the parties' prenuptial agreement regarding the equitable division of certain marital assets and debts and the award of attorney's fees to Alicia; (3) abused his discretion in his awards for monthly child support and tuition costs; and (4) erred in failing to memorialize specifically agreed upon visitation provisions in the posttrial order.

## II.    Denial of Arthur's Request for Sanctions and Attorney's Fees

¶13.    Arthur alleges that the chancellor erred in failing to award him sanctions and attorney's fees for defending Alicia's attacks on the validity of the prenuptial agreement. Mississippi Rule of Civil Procedure 11(b) states:

> If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.

And the Litigation Accountability Act provides, in pertinent part:

> Except as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or

7

party brought an action, or asserted any claim or defense, that is without substantial justification[.]

Miss. Code Ann. § 11-55-5(1) (Rev. 2012). The phrase "'[w]ithout substantial justification' means a filing that is 'frivolous, groundless in fact or in law, or vexatious, as determined by the court.'" *Russell v. Beachwalk Condominiums Ass'n Inc.*, 193 So. 3d 657, 661 (¶8) (Miss. Ct. App. 2016); Miss. Code Ann. § 11-55-3(a) (Rev. 2012). "A claim is frivolous when, objectively speaking, the pleader or movant has no hope of success." *Id.* (internal quotations omitted). "We employ the same test to determine whether a filing is frivolous under both Rule 11 and the Litigation Accountability Act." *Id.* "When reviewing a decision regarding the question of whether to apply sanctions under Rule 11 and the Litigation Accountability Act, the proper standard is abuse of discretion." *Pannagl v. Lambert* (*In re Estate of Pannagl*), 166 So. 3d 39, 41 (¶6) (Miss. Ct. App. 2014); *see also* M.R.C.P. 11. "In the absence of a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors, the judgment of the chancellor regarding whether to apply sanctions will be affirmed." *Id.* (internal quotations omitted).

¶14. Arthur asserts that Alicia and her attorney, Tanya Graham, maliciously and recklessly attacked the validity of the parties' prenuptial agreement. The foundation for his argument derives from his analysis of Graham's billing entries to Alicia, from which Arthur deduces that both Alicia and Graham knowingly perpetuated a fraud upon the court. As such, he argues that Alicia's repeated filing of motions attacking the validity of the prenuptial agreement warrants sanctions.

¶15. Throughout Alicia's attacks on the validity of the premarital agreement, she questioned, among other things, her initials or signatures at the bottom of each page of the prenuptial agreement, as the original agreement could not be located, and neither party had made conscious efforts to locate it. Instead, both parties were in possession of photocopied duplicates, and the chancellor admitted the duplicates as evidence, finding the original agreement was unavailable. In doing so, the chancellor ultimately denied Arthur's request for sanctions and attorney's fees, stating:

> I'm going to find that, right or wrong, simplifying Rule 11, it is, was there any chance whatsoever that [Alicia] could prevail [on her motion to invalidate the prenuptial agreement], and I think there was some chance. Not a great chance, but there was some chance. There was a question about the validity of signatures. The original was lost, if you remember. Nobody could come up with the original. I had to make a finding on that. So the motion [for sanctions and attorney's fees] is going to be denied.

¶16. The chancellor found Alicia's attacks on the validity of the photocopied duplicates were neither frivolous nor without substantial justification. *See Russell*, 193 So. 3d at 661 (¶8); *see also* Miss. Code Ann. § 11-55-3(a). Reviewing the chancellor's findings, and in light of the unavailability of the original prenuptial agreement, we cannot say that the chancellor abused his discretion in denying Arthur's request for sanctions and attorney's fees.

### III. Equitable Distribution According to Prenuptial Agreement

¶17. Arthur contends that certain marital assets and debts were not properly allocated in accordance with the terms of the prenuptial agreement. Specifically, he argues that the chancellor erred with respect to a $159,700 line of credit, a Wells Fargo savings account, 2013 income-tax returns, and the awarding of attorney's fees to Alicia.

9

## A. $159,700 Line of Credit

¶18. When dividing the marital estate, the chancellor omitted a $159,700 line of credit jointly owed by the parties and secured by Arthur's premarital home. This debt was listed on Arthur's and Alicia's Uniform Chancery Court Rule 8.05 financial statements, and both parties testified during trial that the debt was jointly owed. In the final judgment and posttrial order, however, the line of credit was not listed as debt. Arthur argues the failure to include – and divide – this marital debt in accordance with the terms of the premarital agreement was erroneous. We agree.

¶19. The line of credit was acquired through Wells Fargo during the parties' marriage. Alicia contends now, as she did at trial, that the prenuptial agreement did not specifically address marital debts and, therefore, it was within the chancellor's equitable discretion to allocate the line of credit according to equitable principles. She further reiterates that the line of credit was used to refinance Arthur's premarital home (which became the marital home), and contends that the line of credit was used by one of Arthur's businesses to purchase a condominium in the Bahamas that he was ultimately awarded. However, Alicia points to nothing in the record to support the latter contention.

¶20. Because the prenuptial agreement was found to be a valid and enforceable contract, the marital debt should have been included in the chancellor's equitable distribution of the marital estate, and its omission was erroneous. Thus, the debt – if taken alone – should have been divided in accordance with the parties' agreement (i.e., 70% to Arthur, and 30% to Alicia). Its omission, however, resulted in the debt being allocated to neither party.

10

Regardless of the debt's omission from the chancery court's analysis, the record reflects that Arthur and Alicia would remain jointly and severally liable according to the promissory note's terms and conditions. Furthermore, the chancellor stated on the record that he "need[ed] to address the debt," yet it was not accounted for in the original judgment, or the posttrial order.

¶21. We find the failure to include and divide this $159,700 joint debt in accordance with the prenuptial agreement was erroneous, and we reverse and remand as to this issue.

### B.    Wells Fargo Account #7415

¶22. The chancellor awarded to Alicia, as separate property, four bank accounts, including Wells Fargo account #7415. At the time Alicia filed her 8.05 financial declaration, the account possessed $45,137.98. In the final order, the chancellor found that "Alicia used funds from [a]ccount #7415 to support herself and the children during the litigation," and that "Alicia's use of [a]ccount #7415 was for the benefit of the children and she should not be penalized for such." Arthur contends the chancellor's finding as to this account was not supported by substantial evidence in the record. We disagree.

¶23. "Where there is substantial evidence to support the chancellor's findings, [this Court] is without the authority to disturb the chancellor's conclusions[.]" *Buckalew v. Buccluch* (*In re Guardianship of Buckalew*), 62 So. 3d 460, 463 (¶13) (Miss. Ct. App. 2011). Reviewing the record – which contains detailed financial statements and accompanying testimony – we find substantial evidence to support the chancellor's allocation of this account to Alicia. The chancellor had itemized accounting statements for Wells Fargo account #7415, which he

11

concluded was used "for the benefit of the children." Nothing in the record refutes the court's finding so as to render it clearly erroneous.

### C.    2013 Income-Tax Refund

¶24.    Arthur says the chancery court erred in its equitable division of 2013 income-tax refund. When the final order was issued in December 2014, the parties were in the process of filing 2013 tax returns, originally being filed as "married filing jointly." The chancellor determined that according to the prenuptial agreement, Arthur was to receive 70% of the refund when disbursed, with Alicia receiving 30%. But during the posttrial hearing in June 2015, Arthur presented evidence in relation to what the "marital portion" of the overall tax refunds were – because Arthur eventually filed his 2013 tax return as "married filing separately." Arthur offered testimony from his certified public accountant (CPA), Ed Jones. Jones had been the parties' CPA during their marriage, and had prepared their returns in years past. The purpose of Jones's testimony was to supplement the court with information regarding the 2013 return filed since the conclusion of trial.

¶25.    Jones testified that Arthur was due to receive a federal refund of $67,505, and a Mississippi state refund of $23,833. Jones said that Arthur would make routine, estimated tax payments in quarterly installments. Jones also testified that $56,000 of the federal refund, and $9,000 of the state refund, was considered nonmarital because the estimated tax payments were paid with nonmarital assets obtained after the court's May 2013 demarcation date. Arthur contends the remaining balances of $11,505 and $14,833, respectively, are the marital portions of the refunds, which are subject to the terms of the prenuptial agreement.

12

¶26. But in the December 2015 order, the chancellor determined: "[T]he 2013 tax year contains marital funds and should be divided in a manner consistent with the [p]renuptial [a]greement . . . . [Arthur] shall receive 70% of the refund and [Alicia] shall receive 30% of the refund." As Arthur points out, though, the chancellor did not make specific findings as to the precise amounts each party was to receive under the terms of the agreement. Because there was ample evidence from which the chancellor could have made these calculations, we find it proper to remand this issue to the chancery court to make specific findings regarding the equitable division of the 2013 income-tax refunds in accordance with the prenuptial agreement's terms – keeping in mind what portion of the refund was attributable to the income earned after the May 2013 demarcation date.

### D.    Attorney's Fees Awarded to Alicia

¶27. The chancery court awarded Alicia attorney's fees in the amount of $40,000, concluding:

> Technically, Alicia would be forced to withdraw from her 401(k) to pay attorney's fees incurred[.] The [c]ourt finds that Alicia should not be forced to liquidate a portion of her 401(k) and incur taxes and penalties for early withdrawal in order to pay for an attorney. Alicia has no ability to pay attorney's fees unless she withdraws funds or sells assets.

"Generally, attorney's fees should only be awarded where the moving party has demonstrated an inability to pay." *Stuart v. Stuart*, 956 So. 2d 295, 298 (¶20) (Miss. Ct. App. 2006). "A trial court abuses its discretion by awarding attorney's fees without first finding that the party is unable to pay the fees." *Hankins v. Hankins*, 729 So. 2d 1283, 1286 (¶13) (Miss. 1999). "Chancellors are instructed to apply the *McKee* factors in granting or denying attorney's

fees." *Rogers v. Rogers*, 94 So. 3d 1258, 1267 (¶30) (Miss. Ct. App. 2012) (citing *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982)). The *McKee* factors include:

> (1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Burnham-Steptoe v. Steptoe*, 755 So. 2d 1225, 1236 (¶37) (Miss. Ct. App. 1999) (citing *McKee*, 418 So. 2d at 767).

¶28. Arthur argues that under the prenuptial agreement, Alicia waived an equitable right to attorney's fees – albeit not explicitly. In the agreement, Arthur and Alicia waived and released "any and all rights in the real or personal property of the other . . . which may be assertable against the other at law or in equity, which he or she shall acquire by reason of marriage to the other, or which he or she shall have as a spouse of the other." As the prenuptial agreement was found to be valid and enforceable, Arthur asserts that the chancellor's equitable award of attorney's fees to Alicia disregarded the terms of the agreement.

¶29. The stated purpose of the prenuptial agreement, however, was to "fix and determine the rights *accruing to each of them by reason of their marriage* with respect to property and estate of the other and with respect to the right of support of maintenance from the other." (Emphasis added). The right to attorney's fees did not accrue to Alicia as a property right by virtue of marriage. Since the execution of the parties' agreement, the supreme court noted in *Haney v Haney*, 907 So. 2d 948, 957 (¶41) (Miss. 2005), that attorney's fees are "nothing

14

more than an equitable distribution of a different flavor." But we do not find that this language in *Haney*, which has not been cited by any other case, provides a basis for concluding that attorney's fees were waived under the terms of the prenuptial agreement. Attorney's fees were not mentioned in the parties' agreement, and as it predated this *Haney* decision, there was no way anyone reviewing the agreement could have anticipated that attorney's fees would have been covered by that holding. We find no reason to expand the scope of an agreement that is already exceedingly broad.[4]

¶30.    Furthermore, this action involved issues not covered by the terms of the prenuptial agreement, such as child support and payment of the children's educational expenses and insurance. In fact, the agreement expressly provided that no terms "shall be construed as any attempt to waive child support payments." In *Gottlieb v. Gottlieb*, 138 A.D.3d 30, 48 (N.Y. App. Div. 2016), the New York appellate court determined that because the prenuptial agreement did not address "child-related matters," an express waiver in the agreement for attorney's fees did "not preclude an award of counsel fees connected to litigating the child support issues raised in the motion." *See also Vinik v. Lee*, 96 A.D.3d 522, 523 (N.Y. App. Div. 2012) (Since the parties' premarital agreement did not address custody and child support, "the waiver of counsel fees does not apply to counsel fees related to litigating child

---

[4] In addition to the 70/30 disparity in distribution, the agreement excluded Alicia, who left her career to help build Arthur's business and acted as his business manager, from reaping any benefits from his medical practice upon dissolution of the marriage "regardless of the extent to which [Alicia] may participate in the start up and management of that medical practice, with or without compensation[.]" Moreover, the agreement stated that if Alicia became the "primary breadwinner," she would only receive 50% of the marital assets, while Arthur received 70% as primary breadwinner.

custody and support issues.")

¶31.   As Alicia's counsel noted to the court, the majority of the attorney's fees were "where [Alicia] had to argue against [Arthur's] motion for protective order as it related to [Arthur's] current income," which aids in determining child support.  Discussing Arthur's motion for a protective order to restrict the release of information from his employer, Alicia's counsel explained:

> We had to hire a CPA to go through the bank statements . . . . [W]e have a good estimate for what his income is for 2014, which is almost over, but as far as [Arthur] producing [his hospital contract], he just wouldn't do it.
>
> . . . .
>
> So we just don't have anything, and we're here before the Court seeking child support without any information. . . . [W]e withdrew our motion to compel because [Alicia] just simply cannot afford this litigation, and I think [Arthur] knows that.  There's just no sense in us just continuing to fight over everything when she just can't – she simply cannot afford it.  She's almost exhausted everything she has.

Alicia reiterates on appeal that although $16,000 in attorney's fees were incurred "contesting the validity of the premarital agreement," over $80,000 in attorney's fees and expert witness fees were incurred primarily "due to [Arthur's] stubborn litigiousness."[5]

---

[5] Mississippi Rule of Civil Procedure 11-55-5(1) provides in part:

"[T]he court shall award, as part of its judgment and in addition to any other costs otherwise assessed, *reasonable attorney's fees and costs* against any party or attorney if the court, upon the motion of any party or on its own motion, finds that . . . an attorney or party *unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures* available under the Mississippi Rules of Civil Procedure.

(Emphasis added).

16

¶32. Arthur's remaining argument that Alicia had the ability to pay her attorney's fees because she could liquidate her 401(k) has been rejected by this Court on numerous occasions. *See*, *e.g.*, *Branch v. Branch*, 174 So. 3d 932, 946 (¶60) (Miss. Ct. App. 2015) (upholding chancellor's finding that wife did not have to use home equity "as payment for the attorney's fees"); *Rodriguez v. Rodriguez*, 2 So. 3d 720, 732 (¶43) (Miss. Ct. App. 2009) ("An inability to pay could be created if one party would be forced to liquidate a portion of [his or her] retirement or savings accounts in order to pay attorneys' fees."); *Wells v. Wells,* 800 So. 2d 1239, 1247 (¶¶16-17) (Miss. Ct. App. 2001) (wife did not have to use alimony or liquidate her retirement account to pay attorney's fees). Alicia contends that she "had no other source of income than what she earned working for [Arthur]." An award of attorney's fees is "justified where the equities suggest one party should assist the other, and the other party is unable to pay." *Haney*, 907 So. 2d at 957 (¶41).

¶33. Accordingly, we find no abuse of discretion in the chancery court's award of $40,000 in attorney's fees to Alicia.

### IV. Monthly Child-Support Payment and Tuition Costs

¶34. Arthur also takes issue with the chancellor's deviation from the statutory guidelines in awarding child-support payments, as well as the chancellor's findings regarding tuition costs. Mississippi Code Annotated section 43-19-101 (Rev. 2015) governs child-support calculations in Mississippi. According to the guidelines, a noncustodial parent should pay 20% of his or her adjusted gross income as child support for the benefit of two minor children. Miss. Code Ann. § 43-19-101(1). The guidelines create a rebuttable presumption

17

as to the justness or appropriateness of a child-support award, and may only be overcome by a "written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case[.]" Miss. Code Ann. § 43-19-101(2). Moreover, where a noncustodial parent's adjusted gross income exceeds $100,000 per year, "the court shall make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable." Miss. Code Ann. § 43-19-101(4).

¶35. Here, in accordance with the statute, the chancellor found that Arthur's annual adjusted gross income far exceeded $100,000. It was determined through financial statements that Arthur's monthly adjusted gross income amounted to $46,353. As a result, the chancellor found the application of the guidelines unjust, stating: "The minor children in this matter have extraordinary expenses with respect to private school tuition and expenses, extracurricular activities and other hobbies in which they are involved." The chancellor further articulated:

> Payment of 20% of $100,000 would force the children to eliminate their activities, private school education and other needs to which they have accustomed to. The lifestyle known to the children would end and such an end would have a negative impact on the minor children. Both parties acknowledged the desire to continue providing the children with a private school education and to allow the children the maintain their current lifestyle. In order to do so, the [c]ourt must deviate from the statutory guidelines.

Based upon each party's awarded assets and wage-earning capacity, the chancellor ordered Arthur to pay $6,500 per month in child-support payments. Additionally, in light of the parties' agreement to maintain the children's private schooling, Arthur was ordered to pay $3,000 per month ($36,000 annually) towards private-school education of the minor children

18

and their extracurricular activities.

¶36. Arthur argues that the upward deviation from the statutory guidelines was unjust, and the chancellor failed to take into account Alicia's earning capacity. We find there was substantial evidence in the record to support the chancellor's findings. The chancellor complied with the statutory mandate of making specific findings on the record – based in large part upon the mutual agreement among the parties regarding the lifestyle they wished their children to maintain. *See* § 43-19-101(2). Furthermore, the chancellor specifically noted that Arthur's wage-earning capacity "far exceed[ed]" Alicia's, and that Arthur was "financially capable" of providing those sums. Thus, the chancellor took into account Alicia's wage-earning capacity in making his determination. For these reasons, we find no error with the chancellor's decision regarding child-support payments and private-school tuition costs.

## V. Visitation

¶37. Lastly, Arthur asserts that the chancellor erred in failing to include visitation changes specifically agreed upon during the Rule 59 motions hearing in its posttrial order. Because of these omissions, he seeks to have these revised provisions memorialized. Reviewing the original visitation provisions in conjunction with the subsequent on-the-record agreement between Arthur and Alicia, we find this is proper.

¶38. In the original final order, the chancellor set forth specific visitation privileges with which the parties were to comply. For summer each year, the parties agreed that Arthur would receive the children on June 1 until June 21, and on July 10 until July 24. For

Thanksgiving holidays each year, Arthur was to receive the children in odd-numbered years on the day following the last day of school until the day before school was to reconvene. As to Christmas holidays each year, Arthur was to receive the children in the second part of the holiday during odd-numbered years, and the first part of the holiday during even-numbered years.

¶39. However, at the hearing on the Rule 59 motions, Arthur and Alicia verbally revised the provisions of Arthur's visitation privileges with the children. The parties agreed that for summer visitation, Arthur would receive the children the first Sunday of June, and the Sunday following July 9 each year. They further agreed that Alicia would have the children during Thanksgiving in odd-numbered years, and Arthur would have the children in even-numbered years. For Christmas, they agreed that Arthur would have the children the first part of the Christmas holiday in odd-numbered years, and the second part of the holiday in even-numbered years. The parties also agreed that all times relevant to the visitation provisions should be according to Eastern Standard Time, and that Arthur would maintain a $1,000 credit balance with Alicia for the children's noncovered medical expenses. Finally, the parties agreed that any remaining balance in a child's college fund at the conclusion of his or her college schooling would be transferred to the next child for his or her college education.

¶40. Yet none of these revisions were documented in the chancery court's posttrial order except to note that the visitation-exchange times would be on Eastern Standard Time. To avoid future visitation conflicts, Arthur seeks to have the chancery court incorporate these

20

revised provisions in an order. Due to the material changes to dates, as well as which party shall receive the children during odd- or even-numbered years, we find such memorialization necessary. "If parties reach an agreement, the agreement containing the terms should be signed by the parties' attorney(s) or in appropriate cases, the parties, or recorded by the court reporter." *Samples v. Davis*, 904 So. 2d 1061, 1066 (¶15) (Miss. 2004) (discussing agreement of parties in open court). Though Arthur and Alicia's agreement was of record, this is not sufficient to ensure the absence of future conflict regarding these altered provisions. Therefore, we remand on this issue for the chancery court to memorialize the terms of the parties' final agreement regarding Arthur's visitation privileges.

## CONCLUSION

¶41. We affirm the denial of Arthur's request for sanctions and attorney's fees, the award of Wells Fargo account #7415 to Alicia, the award of attorney's fees to Alicia, and the chancellor's child-support and tuition-cost awards. Regarding the chancellor's omission of the $159,700 joint line of credit, we reverse and remand so this debt may be included in the equitable distribution of the marital estate. Additionally, we remand for the chancery court to make specific calculations as to the equitable distribution of the 2013 federal and state tax refunds in accordance with the prenuptial agreement and for proper memorialization of the parties' final agreement related to visitation privileges.

¶42. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLTON, FAIR, GREENLEE AND WESTBOOKS, JJ., CONCUR. LEE, C.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., IRVING AND**

21

**GRIFFIS, P.JJ.  TINDELL, J., NOT PARTICIPATING.**

**WILSON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶43.    I concur in the majority's resolution of all issues in the appeal except the affirmance of the award of attorney's fees to Alicia.  On that issue, I agree with Arthur that the parties' prenuptial agreement precludes the award.  The parties' agreement states that, "[e]xcept as otherwise expressly provided,"

> each of the parties hereby WAIVES and RELEASES any and all rights in the real or personal property of the other, . . . or which may be assertable against the other, which he or she shall acquire by reason of marriage to the other, . . . whether now or hereafter acquired, including without limiting the generality of the foregoing, the following:
>
> . . . .
>
> > 5.    Any right to receive support, temporary support, maintenance, separate maintenance, or alimony from the other during their marriage or following termination of their marriage, except as provided herein.
>
> . . . The parties hereto covenant and agree and contract for adequate consideration, received, that in the event that either of them shall attempt to obtain a . . . decree of separation or divorce . . . , neither will seek any provision for any type of temporary or permanent support or maintenance or any form of alimony or any provision for the settlement of property rights of the parties, which is contrary to the provisions of this Agreement. . . . Alimony [provided for in this Agreement] is inclusive of all types of temporary and permanent support other than child support.

¶44.    Under Mississippi law, an award of attorney's fees based on a spouse's inability to pay is a form of support.  The Supreme Court has explained that Mississippi Code Annotated section 93-5-23 (Rev. 2015) grants "chancellors . . . broad authority to make all orders touching the maintenance and alimony of a wife in a divorce proceeding." *Dillon v. Dillon*,

22

498 So. 2d 328, 331 (Miss. 1986). The Court held that "[t]he scope of the statute is broad and includes granting chancellors the authority to award attorney[']s fees for divorce proceedings." *Id.* Thus, the court's authority to award attorney's fees in a divorce proceeding is a component of the court's statutory authority to award maintenance and support "as may seem equitable and just" under the circumstances. Miss. Code Ann. § 93-5-23.

¶45. Accordingly, the Supreme Court's statement in *Haney v. Haney*, 907 So. 2d 948 (Miss. 2005), that "[a]n award of attorney's fees is nothing more than equitable distribution of a different flavor," *id.* at 957 (¶41), was not novel or unprecedented. The Court explained that "[s]uch awards are justified when the equities suggest one party should assist the other, and the other party is unable to pay." *Id.* It is well-established that "[i]f a divorcing spouse is financially capable of paying his or her attorney's fees, an award of attorney's fees is not appropriate." *Brooks v. Brooks*, 652 So. 2d 1113, 1120 (Miss. 1995). The fact that an award on this basis requires proof of "inability to pay," *id.*, illustrates that such awards are in the nature of support.[6] Therefore, I would hold that an award of attorney's fees based on an inability to pay is barred by the provisions of the parties' prenuptial agreement waiving support, maintenance, and other rights in each other's property beyond what is provided for in the agreement.

---

[6] *Cf. In re Nunnally*, 506 F.2d 1024, 1027 (5th Cir. 1975) (holding that an award of attorney's fees in a divorce that is based on the needs and circumstances of the parties is considered a nondischargeable "support" obligation in bankruptcy); *see also Setser v. Piazza*, 644 So. 2d 1211, 1217 n.1 (Miss. 1994) ("It is . . . settled that attorneys' fees, as a factor in balancing the parties' financial needs, are undischargeable in bankruptcy.").

¶46. The prenuptial agreement would not bar an award of attorney's fees based on a finding of contempt or under the Litigation Accountability Act or Rule 11, and the majority seems to suggest that the award was or could have been justified based on Arthur's "litigiousness." *Ante* at (¶¶31-32). In support, the majority quotes various allegations that "Alicia's counsel noted to the court," that "Alicia's counsel explained," or that "Alicia reiterates on appeal." *Id.* However, allegations made by counsel are not evidence, *Mason v. State*, 440 So. 2d 318, 319 (Miss. 1983), and the chancellor did not find that Arthur or his attorney engaged in contumacious or otherwise sanctionable conduct. The award of attorney's fees was based solely on Alicia's inability to pay her attorney without making a withdrawal from her 401(k) account.

¶47. I would hold that the prenuptial agreement precludes an award of attorney's fees based on Alicia's alleged inability to pay. With that exception, I concur in the majority's resolution of the issues raised on appeal.

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., JOIN THIS OPINION.**